**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No.: 24-cv-81507-MIDDLEBROOKS/Matthewman

ROBIN FLEMING, MISS AMERICA IP,
INC., MISS AMERICA'S SCHOLARSHIP
FOUNDATION, INC., and MAO IP
HOLDING COMPANY, LLC,

        Plaintiffs,

v.

GLENN F. STRAUB, CRAIG T. GALLE,
KATHLEEN A. FIALCO, and PALM
BEACH POLO, INC.,

        Defendants.

_____/

## KLUGER KAPLAN'S RESPONSES TO THE COURT'S INTERROGATORIES

The law firm of Kluger, Kaplan, Silverman, Katzen & Levine, P.L., Todd A. Levine ("**Levine**"), and Terri Ellen Tuchman Meyers ("**Meyers**") (collectively "**Kluger Kaplan**"), through their undersigned counsel, hereby respond to the four (4) interrogatories presented by the Court in its Order Requiring Response to Court Interrogatories and Withdrawal of the Bankruptcy Reference [ECF No. 196] dated February 17, 2026 (the "**Order Requiring Response**"), as follows:

   1) **What was the source of the document(s) you utilized in your filings and arguments in the Related Cases[1]? Please specify the person who provided the document(s).**

   **ANSWER**: Kluger Kaplan never appeared in, or provided any services in connection with, the Related Cases. As a result, Kluger Kaplan does not have any information to provide in response to this interrogatory.

_____

[1] The Order Requiring Response defines the term "Related Cases" to mean Palm Beach County Circuit Court for the Fifteenth Judicial Circuit of Florida, Case No. 50-2024-CA-003851-XXA-MB and United States Bankruptcy Court Case No. 24-22288-EPK.

2) **What, if any, pretrial investigation did you conduct with respect to the authenticity of these documents prior to their use in the Related Cases?**

**ANSWER**: Kluger Kaplan never appeared in, or provided any services in connection with, the Related Cases. As a result, Kluger Kaplan does not have any information to provide in response to this interrogatory.

3) **Upon learning of the claim of fabrication, what investigation, if any, did you conduct into the legitimacy of the document(s)?**

**ANSWER**: To explain Kluger Kaplan's investigation regarding the legitimacy of the subject documents, Kluger Kaplan needs to apprise the Court of the circumstances that preceded and existed at the time of the firm's engagement in this case. That said, and while it is Kluger Kaplan's intention to answer the Court's questions completely, the Court should understand that ***Kluger Kaplan intends to preserve all privileges***, within the limits of the Court's Order.

Between July 4 and 7, 2025, former Defendant Craig Galle ("**Galle**") contacted Levine to request that Kluger Kaplan represent Galle and Defendants Glenn Straub ("**Straub**"), Straub's company, Palm Beach Polo, Inc. ("**PBP**"), and former Defendant Kathleen Fialco ("**Fialco**", and collectively with Galle, Straub and PBP, "**Defendants**") in this case.[2] Galle is a member of the Florida Bar and has served as counsel for Straub and PBP for almost 30 years. Fialco has been the Controller for PBP for many years.

Levine and other members of Kluger Kaplan have known Galle since approximately 1992, because Galle had previously been an attorney at the law firm of Kluger, Peretz, Kaplan & Berlin, P.A., where Levine worked for approximately 17 years following his graduation from law school and where Meyers also worked for approximately 16 years after she completed a clerkship in the United

---

[2] On January 20, 2026, Plaintiffs filed a Joint Stipulation of Dismissal With Prejudice of Plaintiffs' claims against Galle and Fialco [ECF No. 159]. On the same date, Plaintiffs filed Plaintiffs' Notice of Withdrawal With Prejudice of Plaintiffs' Rule 11 Motion against Galle. [ECF No. 160].

States District Court for the Southern District of Florida. Levine and Meyers knew Galle to be an honest and ethical lawyer. Moreover, Levine had remained in contact with Galle over the years and never had any reason to doubt his integrity.

Galle explained that Defendants were seeking counsel to represent them in this case as their previous counsel, William Clayton and Miguel Aristizabal of Clayton Trial Lawyers (collectively, "**Clayton**") had withdrawn because Clayton is a small firm that does not have sufficient resources to represent Defendants properly. Levine had a different case against Clayton previously and had no reason to doubt Galle's explanation. Galle further informed Kluger Kaplan that Straub has dyslexia, a difficult time reading, that he seldom uses email, and that he has a challenging memory. Given the circumstances, Galle explained that he would be the primary client contact but that Straub would also be a point of contact, for the potential representation.

Galle explained that the case relates to the Miss America pageant and assets as well as the companies that purchased them from the former Miss America Organization: Miss America Competition, LLC (which was initially known as Miss America Pageant, LLC for a short period of time before Galle drafted documents to change its name) ("**MAC**") and Miss America IP, LLC ("**MAIP**"). Galle also explained that Robin Fleming is not the owner of MAC or MAIP and that Judge Curley, a judge in the Circuit Court in Palm Beach County, had already determined, following a four-day evidentiary hearing in a parallel, but currently stayed, case between the parties (the "**State Court Action**"), that MAC and MAIP have a substantial likelihood of succeeding on the merits of their claim that Straub is the owner of MAC and MAIP.

Galle informed Kluger Kaplan that Fleming's attorneys had taken the position in the State Court Action that operating agreements for MAC and MAIP (collectively, the "**Operating Agreements**") had been fabricated by Galle and/or Straub. But Galle represented to Kluger Kaplan that Fleming's arguments are demonstrably wrong and that Judge Curley was not persuaded by her

counsel's arguments, despite their contention that the Operating Agreements were fraudulent. Galle represented that the Operating Agreements are legitimate, that he drafted them in late December 2022, and that Straub had signed them at that time. Galle further explained that he did not have metadata for the Operating Agreements anymore because he had drafted them on his laptop computer during the Christmas holiday in 2022, and his laptop was stolen from a car in January 2023 when he was in Ecuador.

Galle also explained that he began retyping the Operating Agreement for MAC (the "**Retyped Draft**") on his desktop computer in August 2023 so that he could amend it in the future in contemplation of bringing Straub's daughter, Kelly Straub Hull, into MAC as a Member, and that there is metadata for the Retyped Draft. Galle confirmed that none of the Defendants had *ever* tried to pass the Retyped Draft off as an original; the Retyped Draft was intended for Galle's personal use only. For example, it contained the typed name of Straub in a different font, which was intended to reflect that it was merely a draft.

Defendants retained Kluger Kaplan and agreed to disclose fully and accurately all pertinent facts surrounding their claims and defenses and to keep Kluger Kaplan informed of all developments. Upon their retention, Kluger Kaplan learned that there were 13 pending discovery requests that required prompt responses, including Plaintiffs' Requests for Production of Documents, Interrogatories, and Requests for Admissions to each of Defendants. Kluger Kaplan met and conferred with Plaintiffs' counsel to seek a reasonable extension of time to respond to the pending discovery given their entry into the case and their need to ramp up.  Plaintiffs' counsel were not willing to agree upon a reasonable extension of time.

Larry Zink ("**Zink**"), one of Straub's other long-time attorneys, and who represented Straub's entities throughout the State Court Action, provided Kluger Kaplan with copies of the pleadings that had been filed in this case, including Plaintiffs' very lengthy Second Amended Complaint, which

comprised 599 paragraphs and 101 pages. [ECF No. 33]. Zink also provided Kluger Kaplan with pleadings from the State Court Action, including the Verified Complaint that had been affirmed by Straub and which included the Operating Agreements as exhibits, as well as Orders that were entered in the State Court Action. In addition, Zink provided Kluger Kaplan with transcripts of depositions from the State Court Action and transcripts from a four-day injunction evidentiary hearing before Judge Curley. During that hearing, Fleming's attorneys argued that the Operating Agreements had been fabricated. While Straub did not testify in the State Court Action, Galle's testimony before Judge Curley was consistent with his explanation and Straub's Verified Complaint concerning the bona fides of the documents.

Kluger Kaplan worked together with Defendants to prepare written responses to the 13 pending discovery requests. Galle drafted the initial responses, because he had the most knowledge of the facts and the ability, as a practicing attorney, to prepare them given the tight deadline that had been imposed for service of the responses. Throughout the entirety of this process, Galle continually maintained that the Operating Agreements are legitimate, and that they were prepared and signed at the end of December 2022. Galle also explained that he had prepared, and Straub had signed, Board Minutes (the "**Minutes**") at the end of December 2022 and the beginning of January 2023 in connection with Board meetings for MAC and MAIP that occurred at that time. Galle explained that the digital version of the Minutes were also on his stolen laptop and he therefore did not have any metadata for them.

The Court granted Defendants a brief extension of 9 days to respond to the First Requests for Production (3 sets) and an additional 7 to 21 days to serve their responses to Plaintiffs' 10 remaining discovery requests. [ECF No. 91]. Kluger Kaplan worked diligently with Defendants to ensure the accuracy of the discovery responses to the best of Kluger Kaplan's ability and to serve the responses in a timely manner. The process was complicated by the length of the Second Amended Complaint,

the materials from the State Court Action, the volume of the pending discovery, and the limited time available to complete the process. Kluger Kaplan worked with Galle, Straub and Fialco to finalize the discovery responses for service. Kluger Kaplan also worked with its IT department to determine how to preserve metadata to ensure that Defendants' discovery responses and production would be as accurate as possible.  Straub and Galle verified by their signatures their answers to the Plaintiffs' interrogatories.

To obtain a complete body of documents for production, Kluger Kaplan coordinated the engagement of an e-discovery vendor to image Straub, PBP, Galle and Fialco's computers and electronic devices to ensure that Defendants' non-privileged documents that were responsive to Plaintiffs' discovery requests would be produced, including their metadata. Kluger Kaplan also communicated with Zink to obtain additional information from the State Court Action.

On August 15, 2025, Kluger Kaplan participated in a meet and confer with attorneys from Carlton Fields, Plaintiffs' former lead counsel in this case. Plaintiffs' counsel notified Levine and Meyers for the first time that they intended to serve an unfiled version of Plaintiffs' Motion for Sanctions on Straub, Galle, and their counsel regarding the Operating Agreements. Plaintiffs' counsel then emailed the Motion for Sanctions to Kluger Kaplan and ***formally commenced the mandatory 21-day "safe harbor" required by Rule 11***. [ECF No. 97 at 17] ("On August 15, 2025, Plaintiffs provided a copy of this motion to former and present counsel for Defendants ***to start the 21-day Safe Harbor for purposes of Rule 11***.") (emphasis added). In their Motion for Sanctions, Plaintiffs demanded that Defendants withdraw the Operating Agreements that Clayton had filed as Exhibits 2 and 3 to Straub and PBP's Amended Counterclaim, and that they withdraw any claims, counterclaims, and defenses based on Straub's assertion that he owned the Miss America Entities. *Id*. The Motion for Sanctions did not mention the Minutes, and to Kluger Kaplan's knowledge, Defendants had not filed the Minutes with the Court.

Kluger Kaplan analyzed Plaintiffs' Motion for Sanctions and discussed the contents of the Motion with Straub, Galle, and Zink. Kluger Kaplan had a lengthy in-person meeting with Straub and Galle, and Zink participated in that meeting via Zoom. Galle confirmed again that there was no metadata for the digital versions of the final Operating Agreements because they were created on his laptop computer, which had been stolen in Ecuador in January 2023, and that he retyped the MAC Operating Agreement in August 2023 so that he could amend the document to bring Straub's daughter into MAC as a Member. Galle also explained that before there was any litigation between the parties, he swapped the first page of the signed MAC Operating Agreement that he had in his possession since December 2022 with a page that included the letter "s" in MAC's name to match the way  the company's name appeared on www.sunbiz.org ("**Sunbiz**") at the time he drafted the Retyped Agreement. Galle noted that he had not made any other corrections to the signed version of the MAC Operating Agreement (as opposed to the Retyped Draft), and he and Straub continued to maintain that the Operating Agreements were signed by Straub at the end of December of 2022. Galle did not believe he ever re-typed the MAIP Operating Agreement. Galle and Straub confirmed that the Operating Agreements that were attached as Exhibits 2 and 3 to Straub and PBP's Amended Counterclaim were accurate copies of the original documents that Straub had signed in December 2022, with the clarification that the MAC Operating Agreement was corrected to swap out the first page to add the letter "s" to MAC's name. Zink emphasized findings that Judge Curley had made in the State Court Action, notwithstanding Fleming's challenge to the legitimacy of the Operating Agreements. [ECF No. 104-13 at 11-12].

Kluger Kaplan requested all evidence in Galle's and Straub's possession confirming that the Operating Agreements were prepared in December 2022 and that Galle's laptop was stolen in January 2023. Kluger Kaplan was not as focused on the Minutes at the time, because they were not a subject of Plaintiffs' Motion for Sanctions, but Galle and Straub confirmed the legitimacy of those

documents as well. Galle provided Kluger Kaplan with copies of his billing records from December 2022, which showed that he had prepared the "corporate formation documents" on December 25, 2022. Galle explained that the corporate formation documents included the Operating Agreements. Galle subsequently provided Kluger Kaplan with copies of his passport, confirming that he was in Ecuador in January 2023, and a receipt for a replacement laptop. [ECF 104-1 at 9–14].

Galle also provided Kluger Kaplan with a copy of a letter from the IRS dated January 3, 2023 (four days after MAC and MAIP closed on their acquisition of the Miss America assets pursuant to an Asset Purchase Agreement, a Membership Interest Agreement, and a Bill of Sale) in Straub's name as the Member (i.e. Owner) of MAC, assigning an EIN number to MAC at Straub's address at PBP [ECF No. 33-16].  Galle and Straub explained that Straub's company, PBP, had paid the debts of the selling entities, as required by the Asset Purchase Agreement. Galle also provided Kluger Kaplan evidence that although an early iteration of the transaction would have had a company owned by Straub's daughter (as the majority owner) and Fleming (as the minority owner), purchasing the Miss America assets, Fleming had refused to sign loan documents and had intentionally left it to Straub to pursue the purchase on his own.

While reviewing Plaintiffs' document production, Kluger Kaplan discovered 1,841 text messages between Fleming and Straub, and emails from Fleming to Galle dated January 7, 2023. In a text dated December 29, 2022 (the day before the closing of MAC and MAIP's acquisition of the Miss America assets), Fleming wrote to Straub "Good morning!  Since it looks like we're moving ahead, can we have a conversation about the details *where I fit in*?"  [ECF No. 104-10] (emphasis added). Kluger Kaplan concluded that a legitimate owner would not find it necessary to ask where she "fit in."  In addition, Fleming's 1,841 text messages, read as a whole, clearly confirmed that Fleming was merely working for Straub and his companies, MAC and MAIP, and that she *later* changed her position to claim that *she* owned MAC and MAIP.

Even more telling, however, were Fleming's January 7, 2023 emails to Galle in which Fleming admitted that Straub, not Fleming, is the owner of MAC and MAIP (which she described as "other Glenn [Straub] entities"). She asked Straub to pay her a salary; bonuses; license and sponsorship commissions; commissions for merchandise that would be sold in a Miss America retail store; indemnification if Straub was sued by third parties; severance benefits if Straub ever fired her from working for MAC or MAIP; travel expenses; and "[s]tock options should Miss America go public and significant profit participation ***should Glenn [Straub] decide to sell one or both entities [MAC AND MAIP]***." [ECF No. 104-17] (emphasis added). Without belaboring the obvious, Fleming would not have to request any of these benefits if she truly owned MAC and MAIP, nor would she have admitted that Straub could sell the entities.

Despite their firm conviction that the Operating Agreements are legitimate, Straub and Galle authorized Kluger Kaplan to withdraw them within the safe harbor period to avoid protracted proceedings and/or argument over the bona fides of the documents, especially given the existence of other evidence demonstrating that Straub is the owner of MAC and MAIP.  Consequently, on September 2, 2025, Kluger Kaplan met and conferred with Plaintiffs' counsel via Zoom. During that meeting, Kluger Kaplan informed Plaintiffs' counsel that Straub and Galle were withdrawing the Operating Agreements during the safe harbor period, and that Kluger Kaplan was working to amend the pleadings before the deadline to do so. Plaintiffs' counsel did not object to this procedure.

Kluger Kaplan worked on amending Defendants' pleadings to correct errors that Clayton had made, likely inadvertently, in the original filings (unrelated to the present answers to the Court's Interrogatories) and to withdraw the Operating Agreements and any references to them in Straub and PBP's counterclaims. Given the length of Plaintiffs' Second Amended Complaint (599 paragraphs, 101 pages) [ECF No. 33], it was extremely time-consuming to prepare and discuss them with Defendants, which took longer than expected.

*On September 5, 2025, Kluger Kaplan filed a Notice of Withdrawal with the Court, notifying Plaintiffs and the Court that Defendants had withdrawn the Operating Agreements and any allegations regarding them from their pleadings*, complying with their obligations pursuant to Plaintiffs' Motion for Sanctions [ECF No. 96]; *see also* Plaintiffs' Motion for Sanctions [ECF No. 97 at 17] ("Moreover, Plaintiffs asked for and conducted a September 4, 2025, meet-and-confer…*regarding the requested Rule 11 relief* with present counsel…During the meet-and-confer, Defendants' counsel stated that *they were withdrawing controversial Exhibits 2-3* (ECF 65-2 and 65-3) from their proposed amended answers, defenses, or counterclaims; *on September 5, 2025, Defendants Straub and Palm Beach Polo filed a notice (ECF 96) of their intent to withdraw these exhibits*.") (emphasis added).

Nevertheless, on September 6, 2025, the day *after* Kluger Kaplan timely withdrew the Operating Agreements for Defendants *within the safe harbor period*, and in contravention of the requirements of Rule 11, Plaintiffs filed their Motion for Sanctions, requesting sanctions against Straub and Galle, and their present and former counsel, pursuant to Rule 11, *without altering the substance of the original Motion for Sanctions* they had previously served on Defendants. *The Motion falsely stated* that "Defendants' present counsel refuses to withdraw the [Operating Agreements] as evidence…" [ECF No. 97 at 2].

Kluger Kaplan continued having regular communications and meetings with Straub and Galle, and sometimes Zink. *None of them* ever departed from their position concerning the legitimacy of the Operating Agreements or the Minutes. Nevertheless, because Plaintiffs had filed an untimely and inappropriate Motion for Sanctions under Rule 11 notwithstanding Kluger Kaplan's timely withdrawal of the Operating Agreements that are the subject of that Motion, Kluger Kaplan was obligated to draft a Response in Opposition to Plaintiff's Motion for Sanctions.

In conjunction with the Response, Kluger Kaplan drafted a proposed affidavit based on

Galle's explanation of the Operating Agreements for Galle's input, review, editing, approval, finalization, and execution. Galle edited, finalized, and executed his affidavit [ECF No. 103-1], which Kluger Kaplan then filed in support of Defendants' Response in Opposition to Defendants' Motion for Sanctions pursuant to Rule 11 [ECF No. 103]. Due to formatting issues and other mistakes that are not pertinent here, Galle corrected and executed a Corrected Affidavit [ECF No.104-1] which was filed together with Defendants' Corrected Response in Opposition to Plaintiffs' Motion for Sanctions.  [ECF No.104].

On September 29, 2025, Plaintiffs filed their Reply in Support of Plaintiffs' Motion for Sanctions [ECF No. 105]. Plaintiffs noted that "[t]he issue presented in the Motion is ***whether Defendants [Straub and Galle] presented <u>two fraudulent operating agreements</u>*** to this Court (and to three others) purportedly establishing Straub's ownership of [MAC and MAIP] and, if so, what sanctions are appropriate."  Plaintiffs expressly confirmed in their Reply that ***"<u>[b]ecause Defendants' present counsel [Kluger Kaplan] did not submit the two operating agreements to this Court (they were submitted by former counsel) and has withdrawn them, Plaintiffs withdraw their claims for sanctions against present counsel [Kluger Kaplan]</u>*** and proceed solely against Defendants and their former counsel." *Id*. (emphasis added).

On November 21, 2025, the Court scheduled a Zoom hearing [ECF No. 127] on Plaintiffs' Motion for Sanctions and Defendants' Motion for Sanctions [ECF Nos. 97 and 141].  The Court held the Zoom hearing on Plaintiffs' Motion for Sanctions on December 11, 2025. The Court explained during the hearing that it was not interested in the ultimate issue of ownership of MAC and MAIP. Instead, the Court decided to "schedule an evidentiary hearing. . .on the issue of these [Operating Agreements], how they came to be filed, whether they are true . . . whether these are true documents and why they were filed and for what purpose is the issue I want to explore." *See* transcript of December 11, 2025 hearing at 45:17–22 [ECF No. 141]. The Operating Agreements are the only

documents that were addressed during the December 11, 2025 hearing. There was no mention of the Minutes, nor any notice that the forthcoming evidentiary hearing would involve the Minutes.

Plaintiffs' counsel confirmed that the hearing was "on Plaintiffs' motions for sanctions against the Defendants Straub and Galle, and their former counsel, *not their current counsel*." *Id.* at p. 4 (emphasis added); *see also id.* at p. 8 ("Plaintiffs most respectfully request that the Court grant Plaintiff's motion for sanctions against Defendants Straub, Galle, *and former counsel* Clayton . . .") (emphasis added). The Court also confirmed that it was "not blaming [Kluger Kaplan] for any wrongdoing," and noted that with respect to the forthcoming evidentiary hearing, "[i]f the lawyers, *the previous lawyers*, want to participate, *they perhaps should* because I guess the conduct I am really looking at is the Defendants Straub and Galle, *and their previous counsel*." *Id.* at pp. 45-46 (emphasis added).

While Galle and Straub have maintained that the Operating Agreements are legitimate, were drafted by Galle and signed by Straub on or about the dates reflected therein and were not created after-the-fact or otherwise fabricated, as Plaintiffs contend, in an abundance of caution, Kluger Kaplan consulted with the Florida Bar ethics department as well as independent ethics counsel to confirm that they had undertaken all appropriate steps to comply with their legal and ethical obligations.

On January 14, 2026, the parties attended Mediation. Plaintiffs settled their dispute with Galle and Fialco. On January 20, 2026, Plaintiffs filed a Joint Stipulation of Dismissal With Prejudice of Plaintiffs' claims against Galle and Fialco [ECF No. 160]. On the same date, Plaintiffs filed a Notice withdrawing Plaintiffs' Motion for Sanctions against Galle, with prejudice. [ECF No. 159].

On January 28, 2026, the Court issued a Paperless Order scheduling the evidentiary hearing on Plaintiffs' Motion for Sanctions for January 30, 2026 [ECF No. 171]. In advance of the evidentiary hearing, Plaintiffs filed a Joint Report that states:

12

In accordance with the Court's January 28, 2026 Order [ECF No. 171], the parties hereby submit this Joint Report in advance of the evidentiary hearing that is scheduled for Friday, January 30, 2026 at 10:30 a.m. The parties' time estimate herein is predicated on the Court's statements at the December 11, 2025 oral argument, wherein the Court informed the parties that the evidentiary hearing would be held to explore the authenticity of the two operating agreements (collectively, the "**Operating Agreements**") that were previously attached as Exhibits 2 and 3 to Glenn F. Straub and Palm Beach Polo, Inc.'s (collectively, "**Defendants**") Amended Counterclaim [ECF. No. 65], until the Operating Agreements were withdrawn by Defendants' current counsel1 on September 5, 2025 [ECF No. 96].

Specifically, the Court stated at the December 11, 2025 oral argument:

> THE COURT: If these [Operating Agreements] were intentionally -- if false documents were intentionally filed with this Court and the State Courts, if that is a smoke screen, it is working, because if I determine that it is, there will be sanctions involved…What I am interested in is whether someone intentionally filed false documents with the Court. If they did, there are ramification. Whether or not you can still win the case or not, I don't know what the sanction would be, but I am extremely concerned if someone knowingly filed a false document and relied on it in our Court or the other Courts, and I think I have clear authority to deal with that. So, that is the issue I am -- *we will schedule an evidentiary hearing on that issue, on the issue of these documents, how they came to be filed, whether they are true -- … whether these are true documents and why they were filed and for what purpose is the issue I want to explore*. The Plaintiff will have a chance to prove its case, I guess you will defend it. If the lawyers, the previous lawyers, want to participate, they perhaps should because I guess the conduct I am really looking at is the Defendants Straub and Galle, and their previous counsel. The question is whether or not they knowingly made false representations to the Court.

[ECF No. 97] (emphasis and bracketed terms in original).

At the commencement of the hearing on January 30, 2026, the Court reminded the parties and counsel that the hearing would be limited to issue of the legitimacy of the Operating Agreements, as framed by Plaintiffs' Motion for Sanctions. ***The Court also repeated its previous assurance that***

13

***Kluger Kaplan was not a subject of the Court's inquiry and that no sanctions were being pursued against them***. *See* Transcript of January 30, 2026 hearing at p. 20 ("***I am not looking, frankly, at your firm because you came in after these documents were introduced in the various courts and you did withdraw them***.") (emphasis added).

Although the Court indicated that it would not consider the ultimate issue of ownership, Plaintiffs' counsel elicited testimony during their direct examination of Fleming and Galle regarding Fleming's purported ownership of MAC and MAIP. This prompted cross-examination on the ownership issue. Nevertheless, Kluger Kaplan did not elicit direct examination from any witnesses during the evidentiary hearings; they only cross-examined Fleming and Galle.

At the conclusion of the evidentiary hearing, the Court instructed the parties to submit proposed Findings of Fact and Conclusions of Law on February 13, 2026. The Court did not explain what the findings would be, leaving it to counsel to present their respective clients' positions for the Court's review and revisions. The Court did, however, acknowledge at that time, that "there is a legitimate dispute over ownership" [of MAC and MAIP]. Transcript of Feb. 2, 2026 evidentiary hearing at 178:2–3.

4) **What reason, if any, do you contend absolves you and your firm from the imposition of sanctions?**

**<u>ANSWER</u>**:  Kluger Kaplan *never* filed or presented the Operating Agreements *in any court*. Instead, Kluger Kaplan timely *withdrew* the Operating Agreements during the safe harbor period in accordance with Rule 11. Kluger Kaplan also *amended* the pleadings to delete references to the Operating Agreements. Under Rule 11, those actions should absolve Kluger Kaplan from the imposition of sanctions.

The Minutes were never mentioned in Plaintiffs' Motion for Sanctions. They were not included in the Notice of the Zoom hearing on Plaintiffs' Motion for Sanctions or in the Notice of

the evidentiary hearings on Plaintiffs' Motion for Sanctions. In fact, the Minutes have never been the subject of *any* Motion for Sanctions or any notice of hearing. Nor did the Court mention the Minutes before the evidentiary hearings. In addition, Kluger Kaplan never filed or presented the Minutes ***in any court***.

Kluger Kaplan conducted a reasonable inquiry under the circumstances, as set forth above, in compliance with their ethical and legal duties. This included, among other things, reviewing the Verified Complaint in the State Court Action, transcripts from the from the four-day evidentiary hearing, including sworn testimony from witnesses in the State Court Action, the order that was entered in the State Court Action following the evidentiary hearing during which Fleming's attorneys argued that the Operating Agreements were fraudulent, and materials provided by Zink. Galle, a seasoned attorney who was well known to, and respected by, Kluger Kaplan also provided sworn affidavits attesting to the validity of the Operating Agreements.

Kluger Kaplan also had abundant evidence that Galle and Straub's position that Straub owns MAC and MAIP is accurate and that Fleming's position that she owns MAC and MAIP lacks evidentiary support. Indeed, Fleming's position concerning her purported ownership is contradicted by, *inter alia*, her own texts and e-mail communications and self-dealings. Thus, there was no reason for Kluger Kaplan to believe that their clients were not telling the truth with regard to the legitimacy of the Operating Agreements (or the Minutes), or their explanations concerning any apparent discrepancies in the documents.

Kluger Kaplan went beyond even the foregoing. In addition to a litany of in-person, telephonic, and Zoom meetings with Galle, Straub, Fialco, and Zink, Kluger Kaplan sought and obtained guidance from the Florida Bar ethics department and independent ethics counsel to ensure compliance with their legal and ethical obligations.

Plaintiffs served their Motion for Sanctions pursuant to Federal Rule of Civil Procedure 11

to enable Straub, Galle, and their counsel to take corrective action during the 21-day safe harbor period before Plaintiffs could or would file the Motion with the Court. [ECF No. 97 at 17]. The entirety of Plaintiffs' Motion for Sanctions was served pursuant to Rule 11. Indeed, Federal Rule of Civil Procedure 11(c)(2) expressly provides:

> Motion for Sanctions. A motion for sanctions ***must be made separately from any other motion*** and ***must describe the specific conduct that allegedly violates Rule 11(b)***. The motion must be served under Rule 5, but it ***must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service*** or within another time the court sets." (emphasis added).

Rule 11 provides an "extraordinary remedy, [that is] to be exercised with extreme caution." *Lopez v. Yvette Pereyra Ans, M.D., P.A.*, No. 09-60734-CIV, 2010 WL 555918, at *1 (S.D. Fla. Feb. 11, 2010). "Rule 11 should not be used to raise issues as to the legal sufficiency of a claim or defense that more appropriately can be disposed of by a motion to dismiss, a motion for judgment on the pleadings, a motion for summary judgment, or a trial on the merits." *Bigford v. BESM, Inc.*, No. 12-61215-CIV, 2012 WL 12886184, at *2 (S.D. Fla. Oct. 12, 2012). Moreover, "[t]he procedural requirements of Rule 11 ***must be strictly construed***." *Seaboard Marine Ltd., Inc. v. Trinpak Packaging Co. Ltd.*, No. 18-CV-22797, 2020 WL 9549553, at *3 (S.D. Fla. June 12, 2020) (emphasis added). "This 'safe harbor' allows the opposing party an opportunity to withdraw or correct the allegedly sanctionable position ***without penalty*** because ***Rule 11(c)(2) bars a motion for sanctions based on*** something "***that is withdrawn or corrected during the twenty-one days***." *Alonso v. Alonso,* No. 18-23668-Civ, 2020 WL 13538527, at *3 (S.D. Fla. Nov. 30, 2020) (emphasis added). Thus, "***to sanction a party that complied with the rule "would undermine the well understood operation of the Rule***." *Id*.; *see also*, *Montoya v. Emergency Ice LLC*, No. 09-20611-CIV, 2009 WL 1362619, at *1 (S.D. Fla. May 13, 2009) ("The purpose of the Rule 11(c)(1)(A) safe harbor provision is to allow the alleged offender to withdraw or correct the document challenged by the Motion for

Rule 11 Sanctions within the 21 day time frame. ***If the document is withdrawn or corrected, the Motion for Rule 11 Sanctions may not be filed with the Court and <u>no sanctions may be imposed</u>***") (emphasis added).

Plaintiffs' Motion for Sanctions was procedurally improper. Plaintiffs filed their Motion despite the fact that Kluger Kaplan had withdrawn the Operating Agreements during the safe harbor period. [ECF No. 96]; *see* Federal Rule of Civil Procedure 11(c)(2).

Plaintiffs' Motion for Sanctions was also misplaced as to their argument that Fleming and not Straub owns MAC and MAIP. Indeed, Plaintiffs abandoned their position that the issue of ownership was an appropriate subject of their Motion for Sanctions in Plaintiffs' Reply, [ECF No. 105 at 1], likely due to, among other things, Fleming's admissions in her December 29, 2022 text to Straub and her January 7, 2023 emails to Galle that Straub is the owner of MAC and MAIP. In fact, and as noted above, the Court made the following observation at the end of the evidentiary hearing:

> There is a -- apparently ***a legitimate dispute over ownership***. I can see from the documents that people presented there are arguments on both sides, whether he was a banker and apparently there were some changes in terms of who was going to own what early on, and that regressed, and whether he was a funder or a banker, and whether he was somehow an owner. Those are probably ***legitimate issues***…

Feb. 2, 2026 Tr. at 178:2–8.

The foregoing notwithstanding, during the evidentiary hearing and in the Order Requiring Response, the Court cited *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), as a possible basis to exercise its inherent authority to impose sanctions. *See* Jan. 30, 2026 Tr. at 7:20–25. *Chambers* is also cited in the Comments to Rule 11. The Comments state that Rule 11 "does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under 28 USC §1927." Fed. R. Civ. P. 11. "***Chambers cautions, however, against reliance on inherent powers if appropriate***

*sanctions can be imposed under provisions such as Rule 11, and the procedures specified in Rule 11—notice, opportunity to respond, and findings—should ordinarily be employed when imposing a sanction under the court's inherent powers*." *Id*. (emphasis added).

Significantly, *Chambers* **predates** the December 1, 1993 amendment to Rule 11, **which added the mandatory 21-day safe harbor period**. *See* Notes of Advisory Committee on Rules - 1993 Amendment.  As a result, *Chambers* could not and did not discuss the effect of taking corrective action during the safe harbor period, as Kluger Kaplan did here.  But Rule 11 makes clear that once Kluger Kaplan timely withdrew the Operating Agreements, Plaintiffs were **prohibited** from filing their Motions for Sanctions with the Court. Thus, no proceedings should have followed (other than perhaps proceedings to inquire as to why **Plaintiffs** violated Rule 11). *See* Federal Rule of Civil Procedure 11(c)(2).

Moreover, the basis for the entry of sanctions in *Chambers* is not analogous to the situation here. The party that was sanctioned in *Chambers* engaged in vexatious litigation and attempted to deprive the court of jurisdiction through fraud, including filing frivolous and false pleadings, repeatedly violating the court's preliminary injunction and restraining orders, and employing egregious tactics to delay and derail the case. *Chambers*, 501 U.S. at 38, 41. The *Chambers* court **gave several warnings** about engaging in such sanctionable conduct, but the litigant continued despite the court's warnings. *Id*. at 38. The adverse party in *Chambers* ultimately moved for sanctions under the court's inherent powers, Rule 11, and 28 U.S.C. § 1927. *Id.* at 40. **Notably,** no **corrective action was taken at any time** in *Chambers*. *See generally, id.* The *Chambers* court determined under the unique facts of that case that Rule 11 was "insufficient for its purposes" because the litigant's sanctionable conduct "could not be reached by Rule 11, which governs only papers filed with a court." *Id.* at 41. Thus, the *Chambers* court invoked its inherent powers because Rule 11 could not

encapsulate the many fraudulent acts that the Court believed constituted a fraud on the court. *Id*. at 41, 51.

Importantly, the *Chambers* court stated, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, ***the court ordinarily should rely on the Rules rather than the inherent power***." *Id.* at 50 (emphasis added). The mandatory terms of Rule 11 extend to "*whether* a court must impose sanctions, not to *which* sanction it must impose." *Id.* at 51 (emphasis in original). Therefore, a court may proceed under its inherent powers to determine *which* sanctions it may impose, but it may not impose <u>any</u> sanctions when the mandatory terms of Rule 11 prohibit such an imposition of sanctions. It should also be noted that the *Chambers* court only sanctioned the sole shareholder and director of the defendant corporation in the matter, ***not counsel***.

The only issue before this Court that was framed by Plaintiffs' Motion for Sanctions was whether the ***timely withdrawn*** Operating Agreements were fabricated and whether that provided a basis to impose sanctions on Straub, Galle, and their former counsel—but ***not*** Kluger Kaplan. Indeed, Plaintiffs expressly withdrew their request for sanctions against Kluger Kaplan [ECF No. 105] and, later, Galle [ECF No. 159]. The *Chambers* case stands for the proposition that although the Court has the inherent power to determine if there has been a fraud, ***it should only do so if Rule 11 does not provide an appropriate avenue of relief***.

Unlike *Chambers*, Rule 11 ***would*** have provided an appropriate avenue of relief in this case, if corrective action had ***not*** been taken within the 21-day safe harbor period. However, Kluger Kaplan withdrew the Operating Agreements on behalf of Straub and Galle within the safe harbor period afforded by Rule 11. [ECF No. 96]. The Minutes were not mentioned in Plaintiffs' Motion for Sanctions, the December 11, 2025 hearing, the parties' Joint Notice, or ***any*** Notices of Hearing leading up to the evidentiary hearings. Because Kluger Kaplan timely withdrew the Operating

Agreements for Straub and Galle, the Court should have denied Plaintiffs' Motion for Sanctions. *See* Fed. R. Civ. P. 11(c)(2); *see also Montoya*, 2009 WL 1362619 at *1; *Trianto v. Guaetta & Benson*, 91 F.4th 556, 561 (discussing the mandatory requirements of the safe harbor provisions of Rule 11, which forbid the motion from being filed if corrective action is taken within 21 days).

There is no basis to sanction Kluger Kaplan because they acted in good faith, conducted a reasonable inquiry, and complied with all of their legal and ethical obligations.   Imposing sanctions under these circumstances would contravene the express provisions of Rule 11 and "would undermine the well understood operation of the Rule." *Alonso*, No. 18-23668-CIV, 2020 WL 13538527, at *3; *Montoya*, 2009 WL 136261, at *1.

On January 29, 2026, the day before the evidentiary hearing, Plaintiffs filed their Notice of Filing Plaintiffs' Witness and Exhibit List for Hearing Scheduled for January 30, 2026. [ECF No. 176]. As part of that filing, Plaintiffs included seven cases that they had not previously cited in their briefing on Plaintiffs' Motion for Sanctions. *See* ECF No. 176 at 5–6. Those cases do not support the imposition of sanctions against Kluger Kaplan, and only two of those cases even discussed sanctions against lawyers.

The court in *Bernal v. All Am. Inv. Realty, Inc*., 479 F. Supp. 2d 1291 (S.D. Fla. 2007) imposed sanctions on an attorney and his client pursuant to the court's inherent authority based on facts that were outrageous and undisputed. *Bernal*, 479 F. Supp. 2d at 1300. The *Bernal* court noted that "at the January 12, 2006 hearing, Hussain [the client] stated that, if a discovery request was not clear to him, he would simply deny the request. Notably, at his deposition, Hussain testified that he denied requests he believed he should not have to answer, because of his view that the lawsuit was 'bogus.'" *Id*. at 1295. ***Kleppin (the attorney) admitted that he "shared his client's view that the lawsuit was 'bogus,'" and thus, facilitated and encouraged his client's behavior by failing to properly oversee his client's discovery efforts****. Id*. (emphasis added).  Notably, the attorney signed

the client's false responses denying that his companies had ever made use of the interstate mail and telephone systems and nationally chartered banks. *Id*. As Magistrate Judge McAliley pointed out, "common sense dictates that any company similar to those Hussain [the client] owns and operates, no matter how small, would receive or place an out-of-state phone call, receive or send mail out of state, or make a deposit in a nationally chartered bank. That Kleppin [the attorney] did not challenge Hussain's [the client's] denial of these inquiries is so unreasonable that it constitutes encouragement of the client's obstructive behavior." *Id*. at 1295–96.

The egregious facts in *Bernal* do not end there. "Shortly before the lengthy December 6, 2005 hearing that resulted in Magistrate Judge McAliley ordering the client to respond to numerous discovery requests, the client telephoned the attorney with information that the plaintiff had allegedly bribed a man named Mohammad Khan for his favorable testimony. Instead of speaking with Khan to gather the facts, the attorney drafted an affidavit for Khan's signature on December 5, 2005, solely based on the client's recounting of what Khan allegedly knew." *Id*. at 1296. The *Bernal* court noted that "[a]lthough the Khan affidavit accused the plaintiff of a serious crime she denied committing, *the record reflects that Kleppin [the attorney] neither (1) conducted any investigation into the facts, including speaking to or deposing Khan; nor (2) took the matter to the proper authorities. Instead, Kleppin [the attorney] focused only on how to use the affidavit to make the case 'go away' for his client."* *Id*. at 1297 (emphasis added).

*Bernal* is very different from the present case. Unlike *Bernal*, Kluger Kaplan repeatedly inquired of Galle and Straub regarding the bona fides of the Operating Agreements (and the Minutes) were false and had further discussions and communications with Zink regarding the State Court Action. Consistent with the sworn representations from the State Court Action, Galle and Straub repeatedly confirmed their explanations to Kluger Kaplan without hesitation, including in Galle's affidavits.

Furthermore, in the State Court Action, in which Fleming's attorney had argued previously that the Operating Agreements were fraudulent, Judge Curley found it noteworthy after conducting a four-day evidentiary hearing that, among other things, Fleming was listed only as MAC and MAIP's "Manager" on Sunbiz (not as a Member) and that she signed the Asset Purchase Agreement and Membership Interest Agreement solely as a President or Manager, wherein the Seller's signatory, Shantel Krebs, signed the same documents, on the same page as and adjacent to Ms. Fleming's signature, as the Managing ***Member*** of the Seller entities. ***Significantly, Judge Curley did <u>not</u> conclude that the Operating Agreements were fraudulent; instead he found that there was a substantial likelihood that Straub is the owner of MAC and MAIP and that Fleming is not***. [ECF No. 104-13 at 11–12].

While the sanctions in *Bernal* were not sought pursuant Rule 11 (and therefore no safe harbor applied), the *Bernal* Court found that the attorney's *threat* that he would file a Rule 11 Motion against the opposing party without complying with the mandatory safe harbor provision violated Rule 11. *Id.* at 1327. Here, the actual filing of a Rule 11 Motion after corrective action has been taken during the safe harbor *violated* Rule 11. Moreover, other courts have found that *Bernal* involved an extreme fact pattern, unlike the situation here. *See, e.g.*, *Goodloe v. Ryal Caribbean Cruises, Ltd*., No. 18-21125-CIV, 2019 WL 1383655, at *5 (S.D. Fla. Feb. 15, 2019) (citing *Bernal* and noting that the attorney made no inquiry about employer client's accusation that employee had bribed a potential witness, made no effort to speak with his client about the accusation, and instead blindly filed an affidavit that was based on fabricated facts). *Bernal* is distinguishable and inapplicable to the present case.

Plaintiffs also cited to the Court's decision in *Trump v. Clinton*, 640 F. Supp. 3d 1321 (S.D. Fla. 2022), aff'd, 161 F.4th 671 (11th Cir. 2025) In that case, Donald Trump and his attorneys filed a complaint that contained false information regarding at least one of the witnesses. Counsel for that

witness sent a letter to Trump's attorneys, providing a list of the false statements regarding the witness that were contained in the complaint and requested that the witness not be named in any forthcoming amended complaint and that if he were not dropped, Rule 11 sanctions would be sought. *Trump*, 640 F. Supp. 3d at 1325. Trump's attorneys ultimately filed an amended complaint that contained the same indisputably false statements against the witness that were not supported by any evidence. *Id.* at 1326. Consequently, the witness sent a 21-day safe harbor letter to Trump's attorneys, which again placed them on notice of the critical failure in their claims. ***Trump and his attorneys did not withdraw their frivolous contentions.*** As a result, this Court imposed sanctions against them. *Id.* at 1326, 1335.

The *Trump* case is distinguishable from this case. Unlike that matter, where there was indisputable evidence that the claims in the amended complaint were false and Trump and his attorneys refused to take corrective action during the safe harbor period, Galle and Straub provided repeated explanations, including ***under oath***, supporting the legitimacy of the Operating Agreements and the Minutes. Further, unlike in *Trump*, where the frivolous claims were not withdrawn during the safe harbor period, or any time thereafter, here the Operating Agreements—which are the only documents that are the subject of Plaintiffs' Motion for Sanctions—were withdrawn within the 21-day safe harbor period. Plaintiffs did not refer to the Minutes in Plaintiffs' Motion for Sanctions, nor did Defendants or Kluger Kaplan ever file or present the Minutes in any Court. Further, the Court instructed the parties that only the Operating Agreements would be the subject of the evidentiary hearings; the Court never mentioned the Minutes. Therefore, unlike *Trump*, Plaintiffs in this case were prohibited from filing Plaintiffs' Motion for Sanctions.

Plaintiffs cited *Hadid v. Alhegelan*, 2000 U.S. Dist. LEXIS 2394 (E.D. VA. Feb. 4, 2000) in their Memorandum of Law in Support of Sanctions Under the Court's Inherent Authority, which they filed with the Court on February 13, 2026 [ECF No. 193]. Although the *Hadid* court imposed

sanctions against a plaintiff pursuant to its inherent power, finding that the plaintiff acted with bad faith intent to deceive the court, ***the court denied the defendant's request for sanctions against the plaintiff's attorney***.  The *Hadid* court noted that "a court should be cautious, ***resorting to sanctions under its inherent power only in three circumstances: (1) where a party's litigation directly benefits others; (2) where a party willfully disobeys a court order; or (3) where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons***. *Id.* at *11-12 (emphasis added), citing *Chambers, 501 U.S. at 45-46,* and other authority.  None of those circumstances provide a basis to sanction Kluger Kaplan in this case.

The *Hadid* court also noted that "[t]here must be a finding of bad faith on the part of the attorney to impose sanctions under 28 U.S.C. §1927." *Id.* at *26 (citing *CTC Imports & Exports v. Nigerian Petroleum Corp., 739 F. Supp. 966, 971 (E.D. Va. 1990)*. The *Hadid* court noted that if an attorney relies ***solely*** on a client's version of the facts, where ***a cursory investigation*** would have put counsel on notice that a document was forged, such conduct can be actionable under §1927." *Id.* (citations omitted) (emphasis added). The *Hadid* court then rejected the defendant's arguments that the plaintiff's attorney made intentional misstatements and that the attorney relied unreasonably on the plaintiff's versions of the facts. The court noted that the "[p]laintiff's former counsel did not rely solely on [the p]laintiff. He stated at the hearing on sanctions that ***he relied on information gained while talking to other lawyers***." *Id*. at *27. "Moreover, the [*Hadid*] [c]ourt believe[d] [the p]laintiff's former counsel's statements as to his good faith efforts to avoid wasting this [c]ourt's resources." *Id*. at *28.  Consequently, the *Hadid* court denied the defendant's motion to sanction the plaintiff's attorney.

Kluger Kaplan did far more than a cursory investigation.  They did not rely solely on their clients' explanations, despite their long history with Galle—an attorney whom they understood to be honest and ethical; they also relied on information provided to them by another attorney, Zink; sworn

testimony and transcripts from the State Court Action; and Judge Curley's injunction order in the State Court Action, after that court conducted a four-day evidentiary hearing and notwithstanding argument from Fleming's counsel to the effect that the Operating Agreements are purportedly fraudulent. [ECF No. 104-13]. Kluger Kaplan also engaged an e-discovery vendor to image Defendants' electronic devices and computers. Furthermore, they reviewed Fleming's emails, plainly admitting that Straub is the owner of MAC and MAIP, which, by implication, supported the authenticity of the Operating Agreements and the Minutes.  In addition, Galle provided affidavits to Kluger Kaplan.

Kluger Kaplan conducted a reasonable and appropriate investigation under the circumstances. Rather than prolong these proceedings, they complied with the demand made in Plaintiffs' Motion for Sanctions. Plaintiffs withdrew their Motion for Sanctions against Kluger Kaplan, and informed this Court multiple times that Plaintiffs are not seeking any sanctions against Kluger Kaplan. This Court also confirmed on several occasions that it was not sanctioning Kluger Kaplan. For the reasons discussed above, Kluger Kaplan respectfully submits that the Court should not impose any sanctions against it.

Respectfully Submitted,

**KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**
*Counsel for Defendants/Counter-Plaintiffs*
201 South Biscayne Boulevard, Suite 1800
Miami, Florida 33131
Telephone: (305) 379-9000

By: /s/ *Terri Ellen Tuchman Meyers*
     **Terri Ellen Tuchman Meyers**
     Fla. Bar No. 881279
     *tmeyers@klugerkaplan.com*
By: /s/ *Todd A. Levine*
     **Todd A. Levine**
     Fla. Bar No. 899119
     *tlevine@klugerkaplan.com*