## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 24-81507-CV-MIDDLEBROOKS

ROBIN FLEMING, MISS AMERICA IP,
INC., MISS AMERICA'S SCHOLARSHIP
FOUNDATION, INC., and MAO IP
HOLDING COMPANY, LLC,

      Plaintiffs,

v.

GLENN F. STRAUB, CRAIG T. GALLE,
KATHLEEN A. FIALCO, and
PALM BEACH POLO, INC.,

      Defendants.

_____/

## ORDER ON SANCTIONS

Tampering with the administration of justice involves more than an injury to a litigant:

> It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Hazel-Atlas Grass co. v. Harford-Empire Co.*, 322 U.S. 238, 246 (1994).

To gain an advantage in a dispute over ownership, Glenn F. Straub and Craig Galle fabricated corporate documents and caused them to be filed and relied upon in this court, the bankruptcy court and state courts in Florida and New Jersey.

Courts have the inherent power to police those appearing before them. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 46 (1991). A court also has the power to conduct an independent investigation

to determine whether it has been the victim of fraud. *Martin v. Automobili Lamborghini Exclusive, Inc.,* 307 F.3d 1332, 1335 (11th Cir. 2002). Fabricating evidence and lying about it constitutes fraud on the court. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978).[1]

## I.    BACKGROUND

Litigation in this court commenced on November 28, 2024, by a Complaint filed by Robin Fleming, Miss America, IP, Inc., Miss America's Scholarship Foundation, Inc. and MAO IP Holding Company, LLC against Glenn F. Straub, Craig T. Galle, Kathleen A. Fialco, and Palm Beach Polo, Inc. (DE 1) After a sua sponte dismissal as a shotgun pleading, and a partial dismissal without prejudice of Counts IV, XVII and XVIII. (DE 27), a Second Amended Complaint ("SAC") was filed on March 17, 2025. (DE 33).

The SAC alleges a series of fraudulent acts as part of a conspiracy to obtain control of Miss America. (DE 1). Of particular significance here, the SAC alleges that Mr. Straub and his attorney Craig Galle fabricated two Operating Agreements and meeting minutes to bolster a claim of ownership and had relied on those documents in the state courts of Florida and New Jersey and bankruptcy court in this district. The allegations of the SAC are detailed and specific as to the reasons Plaintiffs contend the documents were not genuine.

On May 20, 2025, Defendants filed their Amended Answer, Affirmative Defenses, and Counterclaim. (DE 65). Defendants denied all allegations concerning fabrication and counterclaimed seeking ownership. The counterclaim alleges:

> 9. . . . [O]n or around December 28, 2022, Straub through his attorney, Craig T. Galle, created two limited liability companies: one that operates as Miss America Competition, LLC ("MAC") and one that operates as Miss America IP, LLC ("MAIP").

---

[1] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 ( 11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decision of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

10. Effective December 28, 2022, Straub became MAC's sole Member. Attached as Exhibit 2 is a genuine, true, and correct copy of MAC's Limited Liability Company Agreement.

11. Effective December 28, 2022, Straub became MAIP's sole Member and sole Director. Attached hereto as Exhibit 3, is a genuine, true, and correct copy of MAIP's Limited Liability Company Agreement.

(DE 65 at ¶¶ 9-11, 65-2, 65-3).

The Counterclaim requests a judgment declaring: "A. Straub is the sole member and sole owner of MAC and MAIP and as a result the Miss America Companies;" and declaring "B. MAC and MAIP are the owners of the Miss America Companies and the Miss America intellectual property and assets pursuant to the APA." (DE 65 at ¶73)

**A.** **Withdrawal of Counsel, Appearance of New Counsel, and the Sanctions Motion**

On June 25, 2025, Clayton Trial Lawyers, PLLC and its lawyers, William Clayton, Miguel Aristizabal, and Riley Kennedy moved to withdraw as counsel for Glenn Straub, Craig Galle, Kathleen Fialco, and Palm Beach Polo citing "irreconcilable differences…which prevent counsel from continuing to represent Defendants in this action." (DE 80).

The Motion to Withdraw was granted on June 30, 2025, and Defendants were allowed fourteen days to obtain new counsel. (DE 82). On July 7, 2025, Todd A. Levine and Terri Ellen Tuchman Meyers of the law firm of Kluger, Kaplan, Silverman, Katzen and Levine, P.L. ("Kluger Kaplan") entered their Notice of Appearance for the Defendants. (DE 85).

On August 15, 2025, Plaintiffs' counsel served an unfiled copy of a Motion for Sanctions on former and present counsel for the Defendants. (DE 85).

**B.** **Withdrawal of Exhibits 2 and 3, The Operating Agreements**

On September 5, 2025, Mr. Straub, Mr. Galle, and Ms. Fialco, through counsel, notified

the court and counsel of their withdrawal of Exhibits 2 and 3 (DE 65-2, 65-3) to their Amended

Counterclaim (DE 65), and the withdrawal by Mr. Straub and Palm Beach Polo of the last sentence

of paragraph 10 and the last sentence of paragraph 11 of their Amended Counterclaim, where said

exhibits are referenced. (DE 96). The effect was as follows:

- The withdrawn exhibits (Exhibits 2 and 3) are the Operating Agreements dated December 28, 2022, which were appended to Defendants' Amended Counterclaim.

- The last sentence of paragraph 10, which was withdrawn, states: "Attached as Exhibit 2 is a genuine, true, and correct copy of MAC's Limited Liability Agreement."

- The first sentence of paragraph 10, left intact, states: "Effective December 28, 2022, Straub, became MAC's sole Member."

- The last sentence of paragraph 11, which was withdrawn, states: "Attached hereto as Exhibit 3, is a genuine, true and correct copy of MAP's Limited Liability Company Agreement."

- The first sentence, of paragraph 11, left intact, states: "Effective December 28, 2022 Straub became MAIP's sole Member and sole Director."

- Also left intact is paragraph 9: "[T]o that end, on or around December 28, 2022, Straub, through his attorney, Craig T. Galle, created two limited liability companies; one that operates as Miss America Competition, LLC ('MAC') and one that operates as Miss America IP, LLC ('MAIP')."

Thus, while the exhibits were withdrawn, Defendants still continue to request a determination of

ownership in their favor based upon the existence of the Operating Agreements.

On September 6, 2025, Plaintiffs' counsel filed a Motion for Sanctions under Federal Rule

of Civil Procedure 11, Local Rule 11.1, 28 U.S.C. § 1927, and the Court's inherent power to

sanction the submission of falsified evidence. (DE 97). The Motion argues that Mr. Straub and

Mr. Galle intentionally and in bad faith fabricated, presented, and relied upon false documents in

courts in Florida and New Jersey. The Motion seeks sanctions against Mr. Straub, Mr. Galle, and

their former and present counsel, including dismissal of all of Defendants' claims, counterclaims,

and defenses, and an award of attorney's fees.

**C.  The Defendants' Responses and Mr. Galle's Affidavit and Corrected Affidavit**

On September 22, 2025, Mr. Galle and Mr. Straub filed a Response in opposition to the Motion for Sanctions (DE 103), accompanied by an affidavit of Craig Galle (DE 103-1).  The next day, Mr. Galle and Mr. Straub filed a corrected Response in opposition to the Motion for Sanctions (DE 104) and a corrected Affidavit of Craig Galle. (DE 104-1).  The Response argues that the Rule 11 Motion is moot because "to avoid unnecessary motion practice, Straub, PBP and undersigned counsel withdrew the two Operating Agreements and the allegations referencing them from the Amended Counterclaim." (DE 104 at 2).

The corrected Response and corrected affidavit continue to maintain that Mr. Galle drafted the two Operating Agreements in December, but still claim them to be true and correct, because his laptop was allegedly stolen in Ecuador and he had to retype the agreements using a template he had used for years.  In doing so, he says he forgot to change the purpose from the real estate purpose standard in his template.  (DE 104-1 at ¶ 30).  As he "was revising the Operating Agreement in August 2023 he updated the name to add an 's' to Competition" to conform to the misspelling on the website." (DE 104-1 at ¶ 39). In his corrected affidavit, Mr. Galle concludes that "[t]o the best of my recollection" the Operating Agreements that were previously attached to the Amended Counterclaim are "true and correct copies of the documents that Straub executed on or about December 28, 2023, with the clarification that long before any lawsuits were filed between the Parties, I replaced the first page of the MAC Operating Agreement with the updated, corrected page that includes the letter "s" at the end of "Competition" to match the way the company's name appeared on Sunbiz at the time." (DE 104-1 at ¶ 40).

## D. **The Zoom Hearing**

Concerned about the concession that the Operating Agreements being relied upon were not copies of original documents as had been claimed, and that the corrected affidavit included a clarification and caveats about Mr. Galle's "recollection," I noticed a Zoom hearing for December 11, 2025.

Mr. Levine on behalf of the defendants argued that the agreements were not fraudulent, "that they are what they purport to be," but that to avoid unnecessary motion practice, counsel withdrew them from the record. He insisted that Mr. Galle's computer containing the original unexecuted copy had been stolen but that Mr. Galle didn't think there was anything he didn't "have hard copies of or that he couldn't otherwise create." (Dec. 11 Tr. at 12). "It didn't occur to him that these Operating Agreements would become important." (Dec. 11 Tr. at 12). Mr. Levine also acknowledged that in April, 2023, when Mr. Straub asked for proof that he owned the company, Mr. Galle sent a retyped version.

Faced with what I viewed to be an acknowledgment that what had been claimed to be "a genuine, true and correct copy" was, at a minimum, a subsequently prepared and revised document, I stated:

> My question is whether someone knowingly submitted false documents to this court and other courts, because if they did, they will be sanctioned... if not referred for criminal prosecution. Now if it was an accident fine, or if it was just some, you know--- but if that happened, I take that aspect of it seriously. And so whether or not this is a... whether her case is frivolous or great or not great, right now I don't care about that.
>
> What I want to know is whether someone submitted knowingly false documentation to this court or to the state courts or the bankruptcy court. If they did, I think I am obligated to take action.

(Dec. 11 Tr. at 38). After further discussion, I repeated:

> I am extremely concerned if someone knowingly filed a false document and relied upon it in our court or other courts and I think I have clear authority to deal with that.
>
> So that is the issue I am…we will schedule an evidentiary hearing on that issue, on the issue of these documents, how they came to be filed, whether they are true – whether they are in any respect – well, I guess the – whether these are true documents and why they were filed and for what purpose is the issue I want to explore.
>
> The Plaintiff will have a chance to prove its case, I guess you will defend it. If the lawyers, the previous lawyers, want to participate, they perhaps should because I guess the conduct I am really looking at is the Defendants, Straub and Galle, and their previous counsel.

(Dec. 11 Tr. at 46). At the time, I did not focus on the fact that although counsel had removed the Operating Agreements as exhibits, the counterclaim still maintains they remain operative.

## II.   THE EVIDENTIARY HEARING

The evidentiary hearing was held on Friday, January 30, 2026, and continued for a second day on Monday, February 2, 2026.   Robin Fleming, Glenn Straub, and Craig Galle testified. William Clayton, Defendants' former counsel, also attended with counsel.

After careful consideration of the testimony and exhibits presented during the hearing, I find the Operating Agreements and minutes were not prepared or executed in December 2022, as Defendants claim.   They were prepared well after, to fraudulently bolster Mr. Straub's claim of ownership of the entities at issue. My conclusion is based upon the changing explanations concerning the lineage of the Operating Agreements and meeting minutes, the circumstances showing the documents could not have been executed when claimed, the publicly filed and inconsistent corporate documents, and the after-the-fact "stolen laptop saga." My specific credibility determinations and factual findings are set forth below.

## A. **Specific Credibility Findings**

I had an opportunity to observe the testimony of Craig Galle and Glenn Straub. I did not find either of them to be credible.

Mr. Galle was unconvincing and inconsistent in his testimony. At his deposition, he claimed to have drafted the Operating Agreements on Christmas day and that he did not make any changes until they were executed on December 28, 2022. But on cross-examination during the hearing before me, when confronted with the fact that he could not have known the name had changed from Pageant to Competition on December 25th, he said things were in constant flux and he was continuously revising the documents. Mr. Galle also could not explain why the corporate documents filed with the Florida Department of State, most of which he drafted, differed so substantially from the Operating Agreements that he claimed to be drafting simultaneously. Moreover, I observed his demeanor carefully. He largely presented a flat effect, speaking in a monotone when explaining the various versions of the Operating Agreements. He lacked emotional expression, even when being accused of forgery. His only passion seemed to be his devotion to Mr. Straub. I did not believe his explanations.

Mr. Straub was not credible either. He resorted to obfuscation. He did not answer questions directly. When asked a simple yes or no question, he would deliver a stream of consciousness response, unconnected to any issue in the case. He attributed his lack of responsiveness to medical and learning deficiencies. But I find that his evasiveness was deliberate. Mr. Straub is intelligent and he was articulate when he chose to be. His claimed infirmity was situational, depending upon what he was asked. He was more than capable in answering questions when explaining and supporting his version of events, but whenever pressed on the fraudulent documents, he fell back

-8-

on feigned confusion and statements like: "I have to trust these professionals." I did not believe

Mr. Straub either.

And since the evidentiary hearing in this case, I have learned I am not alone in witnessing

behavior like this by Mr. Straub.  In 2013, in finding against Mr. Straub in a case involving

fraudulent transfer, U.S. District Court Judge Cecilia Altonaga wrote:

> Throughout Straub's testimony, the Court had to repeatedly instruct
> Straub to answer the questions asked of him as he consistently failed
> to respond directly.  In addition, Straub avoided answering difficult
> questions by professing ignorance of the matter or a lack of
> recollection, or alternatively, by saying others would know the
> answer but not he.

*Nat'l Mar. Servs. v. Straub*, 979 F. Supp. 2d 1322, 1326 n.3 (S.D. Fla 2013), aff'd., *Nat'l Mar.*

*Servs. V. Straub*, 776 F. 3d 783 (11th Cir. 2015). Moreover, in *In re: 160 Royal Palm, LLC*, Case

No. 18-19441-EPK, U.S. Bankruptcy Judge Erik Kimball wrote the following concerning Mr.

Straub's credibility:

> I was admitted to the bar more than 28 years ago.  Since that time,
> as a lawyer, as a client representative, and as a judge, I have seen
> hundreds of evidentiary hearings and trials.  It is possible that I have
> forgotten a noteworthy witness or two.  But scanning all of those
> hearings, I cannot remember a witness who was more evasive than
> Mr. Straub. Mr. Straub himself and also his counsel suggest that Mr.
> Straub's approach to answering questions is a symptom of several
> infirmities.  Yet this is not consistent with my experience in
> watching Mr. Straub testify in this matter.  When it suited him, Mr.
> Straub could answer yes or no and provide a concise explanation.
> When it did not suit him, Mr. Straub would ramble on at length,
> seemingly addressing a question other than the one asked.  If this
> was not an intentional act on Mr. Straub's part, it is hard to imagine
> how he could have capacity to manage the many significant
> commercial real estate investments that he is solely responsible for
> overseeing.  The Court does not believe that Mr. Straub is unable to
> answer direct questions.  It is clear that Mr. Straub is unwilling to
> answer questions that he perceives are not to his advantage to
> answer.

Mr. Straub's deliberate evasion during his testimony at the evidentiary hearing in this case supports my conclusion that he knowingly signed and relied upon the false Operating Agreements.

**B.  Specific Factual Findings**

*Formation of Miss America Pageant, LLC and Miss America IP, LLC*

1. Plaintiff Robin Fleming had discussions with Shantel Krebs, the CEO and chair of the board of The Miss America Organization ("MAO"), about purchasing the Miss America assets in mid-to-late December 2022.

2. Ms. Fleming formed American Icon Marketing, LLC, a Florida Limited liability Company ("AIM"), on December 9, 2022.

3. On December 24, 2022, Craig Galle ("Mr. Galle") sent Ms. Fleming a draft of the asset purchase agreement to acquire the Miss America assets, which identified AIM and Miss America Productions, LLC as the buyer entities.

4. On December 26, 2022, Mr. Galle prepared a nondisclosure agreement, that was executed that same day, that identifies AIM and Miss America Productions, LLC as the buyer entities for the contemplated Miss America acquisition.

5. On December 28, 2022, at approximately 8:00 AM, Miss America Pageant, LLC was formed as a Florida Limited Liability Company, when Mr. Galle filed Articles of Organization for the entity with the Florida Department of State.

6. The Articles of Organization for Miss America Pageant, LLC filed on December 28, 2022, identify Ms. Fleming as the company's registered agent, authorized representative, and manager, and identify the principal office for the company as Ms. Fleming's home address.

7. On December 28, 2022, at approximately 8:00 AM, Miss America IP, LLC was formed as a Florida Limited Liability Company, when Mr. Galle filed Articles of Organization for the entity

with the Florida Department of State.

8. The Articles of Organization for Miss America IP, LLC filed on December 28, 2022, identify Ms. Fleming as the company's registered agent, authorized representative, and manager, and identify the principal office for the company as Ms. Fleming's home address.

9. Ms. Fleming did not create, and was not aware of any operating agreement for either Miss America IP, LLC or Miss America Pageant/Miss America Competition LLC, and the first time she became aware of such documents was on April 12, 2024.

10. On December 28, 2022, Mr. Galle revised the draft of the asset purchase agreement to list Miss America Pageant, LLC and Miss America IP, LLC (the "Miss America Entities") as the buyers of the Miss America assets.

11. On December 29, 2022, the draft of the asset purchase agreement to acquire the Miss America assets listed Miss America Pageant, LLC and Miss America IP, LLC as the buyers.

*Miss America Pageant LLC is Renamed Miss America Competition, LLC*

12. On December 30, 2022, Ms. Fleming sent an e-mail to Mr. Galle, cc'ing Defendant Glenn Straub ("Mr. Straub"), requesting Mr. Galle to change the name of Miss America Pageant, LLC to Miss America Competition, LLC.

13. On December 30, 2022, Mr. Galle revised the draft asset purchase agreement to identify Miss America Competition, LLC, instead of Miss America Pageant, LLC, as one of the buyers of the Miss America assets. The same day, Mr. Galle prepared amended articles of organization to change the name of Miss America Pageant, LLC to Miss America Competition, LLC.

14. On January 6, 2023, Ms. Fleming filed the Articles of Amendment to the Articles of Organization for Miss America Pageant, LLC to change the name of the company to Miss America Competition, LLC. Mr. Galle prepared the Articles of Amendment, but Ms. Fleming

signed and mailed the Articles of Amendment, along with a personal check, to the Florida Secretary of State's office.

15. The name change from Miss America Pageant, LLC to Miss America Competition, LLC was not reflected on the Florida Secretary of State website until the end of March 2023. When the name change was reflected on the Florida Secretary of State website in March 2023, there was a typo so the company name was incorrectly identified as Miss America Competitions, LLC (plural) on the website. This typo was not corrected on the website until the end of April or beginning of May 2024.

### *The Operating Agreements*

16. In March 2024, Mr. Galle, on Mr. Straub's behalf, sent Ms. Fleming a proxy lawsuit against members of Ms. Fleming's and Mr. Straub's property owners association which included Ms. Fleming as the proposed plaintiff.

17. At a meeting on March 16, 2024, Ms. Fleming informed Mr. Straub that she would not serve as plaintiff in the lawsuit he was contemplating. Mr. Straub responded to this by claiming he was the owner of Miss America.

18. After this meeting with Mr. Straub, Ms. Fleming looked through the Miss America documents to assess how Mr. Straub could be claiming ownership and discovered the EIN paperwork for Miss America Competition, LLC had gone to the address of Mr. Straub's business, Palm Beach Polo, Inc. ("PBP"), instead of Ms. Fleming's home address. Ms. Fleming brought the document she was given to former-Defendant Kathy Fialco, an employee of PBP, and discovered that, on January 3, 2023, Mr. Galle had sent Ms. Fleming altered EIN paperwork for Miss America Competition, LLC, which whited-out Mr. Straub's name on the document.

19. On April 11, 2024, Ms. Fleming met with Mr. Straub at his office and Mr. Straub asked Ms.

Fleming to sign a document that assigned her interest in the Miss America entities to Mr. Straub. When Ms. Fleming refused, Mr. Straub called Mr. Galle from his office and put Mr. Galle on speaker phone so that Ms. Fleming could hear the conversation. Mr. Straub asked Mr. Galle if the operating agreement was finished and whose name is on the document. Mr. Galle responded that it was finished and had Mr. Straub's name on it.

20. On April 11, 2024, Mr. Galle emailed Mr. Straub's assistant, Rina Osle, a document that purported to be a Limited Liability Company Agreement of Miss America Competition, LLC (the "April 11 MAC Operating Agreement") and requested that Ms. Osle "print the attached document for GFS [Glenn F. Straub]." (PX 28; PX 56 at ¶¶ 4, 29-36]. Relevant here:

   a. The "Effective Date" of the April 11 MAC Operating Agreement is December 28, 2022.

   b. Section 4 of the April 11 MAC Operating Agreement, which describes the company's "purpose," states: "The purpose of the Company is to (i) own and develop real property located in St. Lucie County, Florida, and (ii) to engaged in any other business activity that is incidental to, or in furtherance of, the foregoing or such other businesses as the Manager may decide from time to time."

   c. Section 8, which addresses the "Management of Company," subpart (b) provides: "As of the Effective Date, the Manager shall be Glenn F. Straub. The Manager shall serve until the earliest of the following to occur: (i) the resignation of the Manager (at which time the outgoing Manager may designate a person controlled by Glenn F. Straub as the successor Manager), (ii) Glenn F. Straub ceases to be or control the Manager, or (iii) Glenn F. Straub becomes incapacitated. Following any of the events set forth in the immediately preceding clauses (ii) or (iii), the Manager shall be appointed by the Members owning a majority of the Units."

   d. The signature page for the April 11 MAC Operating Agreement includes two signature lines, one for the "Manager" and one for the "Member," both of which have only a typed or stamped signature for Mr. Straub.

21. On April 12, 2024, Ms. Fleming met with Mr. Straub again, in person (the "April 12 Meeting"). Two other people attended the April 12 Meeting: Mr. Straub's attorney, Alex Domb, and Tiffany Richtmyer.

-13-

22. At the April 12 Meeting, Mr. Straub showed Ms. Fleming a document that had his handwritten notes on it. Mr. Straub asked Mr. Domb to make a copy of the document for Ms. Fleming, which he did and handed Ms. Fleming the copy.

23. The document that Mr. Domb handed Ms. Fleming at the April 12 Meeting was titled Limited Liability Company Agreement of Miss America Competition, LLC (the "April 12 MAC Operating Agreement"). Prior to being handed the April 12 MAC Operating Agreement at the April 12 Meeting, Ms. Fleming had never seen a document purporting to be a limited liability agreement for Miss America Competition, LLC.

24. The April 12 MAC Operating Agreement is the same as the April 11 MAC Operating Agreement, described in paragraph 29, *supra*, except that the April 12 MAC Operating Agreement had Mr. Straub's handwritten notes on it.

25. When Ms. Fleming was handed the April 12 MAC Operating Agreement she stated to Mr. Straub and the others in attendance at the April 12 Meeting that the document was a "fraud".

26. Four days after the April 12 Meeting, on April 16, 2024 at 1:03 pm, Mr. Galle sent Ms. Fialco unsigned copies of two documents: a Limited Liability Company Agreement of Miss America Competitions, LLC (plural) (the "April 16 Unsigned MAC Operating Agreement") and a Limited Liability Company Agreement of Miss America IP, LLC (the "April 16 Unsigned MAIP Operating Agreement").

27. The April 16 Unsigned MAC Operating Agreement differs from the April 11 MAC Operating Agreement and April 12 MAC Operating Agreement in the following respects:

    a. The name of the company is identified as Miss America Competition*s*, LLC (plural). (PX 29-2) (emphasis added).

b.  Section 4 of the April 16 Unsigned MAC Operating Agreement, which addresses the company's purpose, correctly states: "The purpose of the Company is to (i) own, manage, operate, promote and state the Miss America Competition/Pageant,, [sic] and (ii) to engage in any other business or activity that is incidental to or in furtherance of, the foregoing or such other business as the Manager may decide from time to time."  (PX 29-2).

c.  Section 8(b) now states: "As of the Effective Date, the Manager *and sole Director* shall be Glenn F. Straub (the "Manager").  The Manager shall serve until the earliest of the following to occur: (i) the resignation of the Manager (at which time the outgoing Manager may designate a person controlled by Glenn F. Straub as the successor Manager), (ii) Glenn F. Straub ceases to be or control the Manager, (iii) Glenn F. Straub becomes incapacitated, *or (iv) Glenn F. Straub sells, assigns or transfers more than 90% of 100% of the Membership Units that are held and owned by him*.  Following any of the events set forth in the immediately preceding clauses (ii) or (iii), the Manager shall be appointed by the Member(s) owning a majority of the Units." (PX 29-5) (emphasis added).

d.  On the signature page, there are three signature lines, for "Manager," "Sole Member," and "Sole Director."  (PX 29-12).

28. Later in the afternoon on April 16, 2024, Mr. Galle sent Ms. Fleming's attorneys signed copies of the Limited Liability Agreement of Miss America Competitions, LLC (the "April 16 Signed MAC Operating Agreement") and Limited Liability Agreement of Miss America IP, LLC (the "April 16 Signed MAIP Operating Agreement" and, with the April 16 Signed MAC Operating Agreement, the "April 16 Signed Operating Agreements").  The April 16 Signed MAC Operating Agreement is the same as the April 16 Unsigned MAC Operating Agreement, except that the April 16 Signed MAC Operating Agreement bears Mr. Straub's wet signature on all three signature lines on the signature page.

29. The April 16 Signed MAIP Operating Agreement is the same as the April 16 Unsigned MAIP Operating Agreement, except that the April 16 Signed MAIP Operating Agreement bears Mr. Straub's wet signature on all three signature lines on the signature page. (PX 29-14 – PX 29-26; PX 30-17 – PX 30-29).

30. Ms. Fleming received the April 16 Signed Operating Agreements from her attorneys on April 17, 2024. When Ms. Fleming received these documents from her counsel on April 17, 2024, it was the first time Ms. Fleming received (a) a signed document purporting to be a limited liability company agreement for Miss America Competition, LLC and (b) any document purporting to be a limited liability company agreement for Miss America IP, LLC.

31. On April 22, 2024, Mr. Galle e-mailed Ms. Osle various documents, stating "[a]ttached for GFS." (PX 31). Among the documents attached to Mr. Galle's April 22, 2024 e-mail were: (a) a document titled "Minutes of Initial Meeting of The Member and Director of Miss America IP, LLC," dated December 28, 2022 (PX 31-2) ("Unsigned MAIP Initial Meeting Minutes"); (b) a document titled "Minutes of Initial Meeting of Member and Director of Miss America Pageant, LLC," dated December 28, 2022 (PX 31-3) ("Unsigned MAP Initial Meeting Minutes"); and (c) a document titled "Minutes of Meeting of Member and Director of Miss America Pageant, LLC," dated January 5, 2023 (PX 31-4) ("Unsigned MAP Meeting Minutes" and, with the Unsigned MAIP Initial Meeting Minutes and Unsigned MAP Initial Meeting Minutes, the "Unsigned Meeting Minutes").

32. The Unsigned MAIP Initial Meeting Minutes and Unsigned MAP Initial Meeting Minutes describe meetings allegedly held on December 28, 2022, at which Mr. Straub and Mr. Galle were present, and reflect the appointment of Mr. Straub and Ms. Fleming as the co-Managers of Miss America IP, LLC and Miss America Pageant, LLC, respectively. (PX 31-2; PX 31-3).

33. In the summer of 2024, counsel for Mr. Straub submitted signed versions of the Unsigned Meeting Minutes (the "Signed Initial MAP Meeting Minutes," the "Signed Initial MAIP Meeting Minutes," and the "Signed MAP Meeting Minutes," and collectively, the "the "Signed Meeting Minutes") in proceedings for a temporary restraining order in a Florida state court

action Mr. Straub brought against Ms. Fleming and the Miss America Entities.  Ms. Fleming and her counsel had not previously received the Signed Meeting Minutes (or Unsigned Meeting Minutes) prior to when they were proffered in the temporary restraining order proceedings.

34. The Signed Meeting Minutes are the same as the Unsigned Meeting Minutes, except that the Signed Meeting Minutes bear Mr. Straub's wet signature.  (PX 12; PX 31).

### *The Fraud*

35. The April 16 Signed Operating Agreements were *not*, as Mr. Galle claims (Jan. 30 Tr. at 131:23-132:15), drafted on December 25, 2022, and signed by Mr. Straub on December 28, 2022.  This is evident from the following facts:

    a. On December 25, 2022, Mr. Galle supposedly drafted the April 16 Signed Operating Agreements and testified he did not revise either of the operating agreements between when he supposedly drafted them on December 25, 2022 and when Mr. Straub supposedly signed them on December 28, 2022.  But, on December 25, 2022, the contemplated buyer entities for the Miss America assets were AIM and Miss America Productions, LLC, not Miss America Competition, LLC and Miss America IP, LLC.

    b. On December 28, 2022, when Mr. Straub supposedly signed the April 16 Signed Operating Agreements, there was no entity called Miss America Competitions, LLC (plural); the company formed on that date was named Miss America Pageant, LLC and the name change to Miss America Competition, LLC (singular) was not raised until two days later, on December 30, 2022.  In fact, all of the other documents drafted (or supposedly drafted) on December 28, 2022 identify Miss America Pageant, LLC, not Miss America Competition or Competitions LLC, including the Articles of Organization for Miss America Pageant, LLC that Mr. Galle prepared and filed.

    c. The name Miss America Competitions, LLC (plural), which is the name of the company identified in the April 16 Signed MAC Operating Agreement, is the result of a typographical error that was not reflected on the Florida Secretary of State website until the end of March 2023 and was only called to Mr. Straub's attention on April 12, 2024.

    d. The April 16 Signed Operating Agreements identify only Mr. Straub as the Manager of the two Miss America Entities, while the Articles of Organization for the Miss America Entities that were filed on December 28, 2022, identify only Ms. Fleming as the Manager of the two Miss America Entities.

      e. Neither Mr. Galle, nor Mr. Straub ever showed the purportedly signed December 28, 2022 operating agreements to Ms. Fleming (at least not until April 2024), despite Mr. Galle's admission that Ms. Fleming was a manager and that the operating agreements "talk[] about what powers the managers have[.]" (Jan. 30 Tr. at 146:17-147:15). Mr. Galle's explanation, that he had "[n]o reason why, she wasn't the owner" is not plausible. (Jan. 30 Tr. at 146:17-21).

36. I find by clear and convincing evidence that the April 16 Signed Operating Agreements were, at Mr. Straub's direction, prepared by Mr. Galle between April 12, 2024, and April 16, 2024, and signed by Mr. Straub on April 16, 2024, as shown by the following:

      a. On April 11, 2024, Mr. Straub asked Mr. Galle if he had finished the corporate documents for the Miss America Entities that included his name on them and Mr. Galle informed Mr. Straub that he had. In all likelihood Mr. Straub instructed Mr. Galle to prepare at least the April 11 MAC Operating Agreement on or shortly before April 11, 2024.

      b. The April 11 MAC Operating Agreement and April 12 MAC Operating Agreement included errors that were identified by Ms. Fleming to Mr. Straub at the April 12 Meeting.

      c. The April 16 Unsigned MAC Operating Agreement and April 16 Signed MAC Operating Agreement corrected (or attempted to correct) the errors Ms. Fleming identified in the April 12 MAC Operating Agreement at the April 12 Meeting. It is likely that, following the April 12 Meeting, Mr. Straub instructed Mr. Galle to correct the errors identified by Ms. Fleming in the April 12 MAC Operating Agreement.

      d. The April 16 Unsigned Operating Agreements and April 16 Signed Operating Agreements also included additional material not found in the April 12 MAC Operating Agreement seemingly designed to strengthen Mr. Straub's claim of ownership over the Miss America Entities, including identifying Mr. Straub as the "Sole Member" and "Sole Director."

      e. Mr. Galle sent the April 16 Unsigned Operating Agreements to Ms. Fialco at approximately 1:03 pm on April 16, 2024, and then, later that same day, Mr. Galle sent the April 16 Signed Operating Agreements to Ms. Fleming's counsel. It can, thus, be inferred that Mr. Straub signed the April 16 Signed Operating Agreements on April 16, 2024.

      f. Defendants have never produced any metadata for the April 16 Unsigned Operating Agreements or the April 16 Signed Operating Agreements.

37. While Mr. Galle's testimony concerning the April 16 Signed Operating Agreements has been

evolving, he admits that the April 16 Signed MAC Operating Agreement is not a true and correct copy of what was claimed to be signed in December 2022:

    a. Mr. Galle initially testified that: (i) in December 2022 he drafted the operating agreements for the Miss America Entities on his laptop, (ii) Mr. Galle printed those agreements and Mr. Straub signed them on December 28, 2022 and maintained those signed documents in his paper files, (iii) in January 2023, Mr. Galle lost the laptop on which he prepared the operating agreements, (iv) in August 2023, Mr. Galle retyped the operating agreement for Miss America Competition, LLC, but not Miss America IP, LLC, because Mr. Straub was contemplating adding his daughter to the company, and (v) the April 16 Signed Operating Agreements, which were attached to Mr. Straub's and PBP's Counterclaim, "are true and correct copies of the documents that Straub executed on or about December 28, 2022, with the clarification that long before any lawsuits were filed between the parties, [he] replaced the first page of the MAC Operating Agreement with the updated, corrected page that includes the letter 's' at the end of 'Competition' to match the way the company's name appeared on Sunbiz at the time." (PX 56 at ¶¶ 22-23, 26-32, 39-40; Jan. 30 Tr. at 131:1-132:24, 157:15-21).

    b. At his deposition and the hearing, Mr. Galle testified that, in or around August 2023, he also corrected the section addressing the company's "purpose" when he replaced the first page of the Miss America Competition, LLC operating agreement to add an "s" to the end of "Competition." (Jan. 30 Tr. at 149:2-150:25, 186:13-187:19).

    c. At his deposition and the hearing, Mr. Galle also testified that, in or around August 2023, he also revised Section 8 of the Miss America Competition, LLC operating agreement to designate Mr. Straub as the sole director and add an additional subsection and replaced the page with Section 8 in the version of the operating agreement that Mr. Straub supposedly signed on December 28, 2022. (Jan. 30 Tr. at 187:21-189:11; PX 5; PX 9).

    d. Accordingly, the April 16 Signed Operating Agreement is *not* a true and correct copy of the document that Mr. Galle claims was signed on or around December 28, 2022.

38. Mr. Galle's testimony that a version of the Miss America Competition, LLC operating agreement existed and was signed by Mr. Straub on December 28, 2022, and that Mr. Galle, then, replaced certain pages of that document in or around August 2023, is not credible.

39. Further, if, as he now claims, Mr. Galle: (i) lost the laptop on which he drafted the operating agreements for the Miss America Entities that Mr. Straub signed in December 28, 2022, (ii) thereafter redrafted only the Miss America Competition, LLC operating agreement in

August 2023, (iii) revised the redrafted Miss America Competition, LLC operating agreement in or around August 2023, but did not save those changes in electronic form, (iv) nonetheless printed out the revised pages and replaced the corresponding pages in the hard copy of the Miss America Competition, LLC operating agreement that Mr. Straub signed December 28, 2022, and (v) did not have Mr. Straub re-sign the Miss America Competition, LLC operating agreement. (PX 56 at ¶¶ 22-23, 26-32, 39-40; Jan. 30 Tr. at 131:1-132:24, 139:16-141:22, 157:15-21, 186:13-189:5):

    a. Mr. Galle *would **not** have an **unsigned** version of the Miss America Competition operating agreement reflecting the August 2023 revisions*; he would only have a *signed version* of the Miss America Competition operating agreement reflecting these revisions. Stated another way, if Mr. Galle's testimony were true, the April 16 *Unsigned* MAC Operating Agreement would *not* exist; only the April 16 *Signed* MAC Operating Agreement would. Yet, the April 16 Unsigned MAC Operating exists and includes the very same revisions that Mr. Galle supposedly made and inserted into the April 16 Signed MAC Operating Agreement in August 2023. (PX 29-2 – PX 29-13; PX 30-5 – PX 30-16).

    b. The April 16 Unsigned MAIP Operating Agreement would not exist either, because any electronic, unsigned version of the Miss America IP, LLC operating agreement would have been lost when Mr. Galle lost his laptop in January 2023 and Mr. Galle does not claim to have retyped the Miss America IP, LLC operating agreement following the loss of his laptop.

    c. There would be no signed or unsigned version of the Miss America IP, LLC operating agreement that includes the revisions that Mr. Galle supposedly only made to Section 8 of the Miss America Competition, LLC operating agreement in August 2023 (*i.e.*, identifying Mr. Straub as the "sole Director" and adding subsection (iv)). Yet, both the April 16 Unsigned MAIP Operating Agreement and April 16 Signed MAIP Operating Agreement reflect these revisions (PX 29-17; PX 30-20).

40. The Signed Meeting Minutes were not, as Mr. Galle claims, prepared and signed by Mr. Straub on December 28, 2022, and January 5, 2022. This is evident from the following facts:

    a. The Signed Initial MAP Meeting Minutes and Signed Initial MAIP Meeting Minutes reflect that Mr. Galle attended two initial meetings with Mr. Straub for the Miss America Entities on December 28, 2022, but the preparation of such meeting minutes and Mr. Galle's attendance at such meetings are not reflected in Mr. Galle's billing records for December 28, 2022.

b. The Signed MAP Meeting Minutes reflect that Mr. Galle attended a meeting with Mr. Straub for Miss America Pageant, LLC on January 5, 2023, but the preparation of such meeting minutes and Mr. Galle's attendance at such meeting are not reflected in Mr. Galle's billing records for January 5, 2023.

c. The Signed Initial MAP Meeting Minutes and Signed Initial MAIP Meeting Minutes reflect that Mr. Straub appointed both himself and Ms. Fleming as co-Managers of the Miss America Entities on December 28, 2022. However, the Articles of Organization for both the Miss America Entities, which were prepared and submitted on December 28, 2022, identify only Ms. Fleming as the Manager of the Miss America Entities; and, the operating agreements for the Miss America Entities that Mr. Straub supposedly signed on December 28, 2022 only identify Mr. Straub as the Manager of the Miss America Entities.

d. The Signed MAP Meeting Minutes supposedly executed on January 5, 2023 provide that the name of Miss America Pageant, LLC will be changed to Miss America Competitions, LLC (plural). However, Ms. Fleming's instruction regarding the name change and the paperwork ultimately filed on January 6, 2023 to change the name of Miss America Pageant, LLC identified Miss America Competition, LLC (singular) as the new name for the entity.. The entity was only identified as Miss America Competitions, LLC (plural) as a result of a typographical error on the Florida Secretary of State website that first appeared in March 2023.

41. I find that the Signed Meeting Minutes were, at Mr. Straub's direction, prepared by Mr. Galle sometime after April 12, 2024, and signed by Mr. Straub sometime on or after April 22, 2024, as evidenced by the following:

a. The Signed Meeting Minutes were not initially shared with Ms. Fleming at the April 12 Meeting and, unlike the April 12 MAC Operating Agreement and April 16 Signed MAC Operating Agreement, correctly identify the entity as Miss America Pageant, LLC. I can reasonably infer from these facts that: (i) the Signed (or Unsigned) Meeting Minutes did not exist as of April 12, 2024; (ii) Mr. Galle and/or Mr. Straub realized that Ms. Fleming's comment about the "wrong name" on the April 12 MAC Operating Agreement referred to the correct entity being Miss America Pageant, LLC, not Miss America Competitions, LLC (plural) sometime after the April 16 Signed Operating Agreements were sent to Ms. Fleming's counsel; and (iii) Mr. Galle, at Mr. Straub's direction, tried to correct that error after the fact by drafting the Unsigned Meeting Minutes.

b. Mr. Galle sent the Unsigned Meeting Minutes to Ms. Osle on April 22, 2024 and then, a month later, Mr. Straub submitted the Signed Meeting Minutes to the court in a lawsuit he initiated against Ms. Fleming. Therefore it is likely that Mr. Straub signed the Signed Meeting Minutes sometime after April 22, 2024.

-21-

42. Mr. Galle's testimony that the Signed Meeting Minutes were prepared on or around December 28, 2022, and January 5, 2023, and signed by Mr. Straub on or around those same dates is not credible.

### *The Fraudulent Agreements are used in Four Different Courts*

43. Mr. Straub submitted one or both of the Signed Operating Agreements as "genuine, true and correct" copies to four separate courts.

44. *Florida State Court:* On April 25, 2024, Mr. Straub initiated a lawsuit in the Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida, Case No. 2024-CA-003851, against, *inter alia*, Ms. Fleming and several Miss America Companies. (PX 39). Mr. Straub verified the Complaint, attesting that he had read the complaint and to "the best of his knowledge and belief, the allegations are true, correct and accurate." (PX-39-15). Attached to the complaint were two Limited Liability Company Agreements: one for Miss America Competitions, LLC (dated December 28, 2022) and one for Miss America IP, LLC (dated December 28, 2022). (PX 39, ¶¶ 12, 13). In paragraph 12 of the complaint, Mr. Straub verified that the attached "Exhibit 2, is a genuine, true and correct copy of the December 28, 2022 Limited Liability Company Agreement of Miss America Competitions, LLC ("MAC"), which sets forth that Glenn F. Straub is the sole Member and Sole Director." In the following paragraph 13, Mr. Straub again asserted that the attached "Exhibit 3, is a genuine, true and correct copy of the December 28, 2022 Limited Liability Company Agreement for Miss America IP, LLC ("MAIP"), which sets forth that MAIP was organized and formed and is 100% owned by Glenn F. Straub." (PX 39, ¶ 13).

45. *New Jersey State Court:* In another lawsuit filed in the Superior Court of New Jersey, Case No. ATL-L-202-24, Mr. Straub, through his attorney Mr. Galle, again filed copies of the subject

operating agreements. (PX 27). On June 8, 2024, Mr. Galle signed a "Certification" to the New Jersey court and, "[a]ttached as Exhibit 'B'" a purported "true and correct copy of the Limited Liability Company Agreement of MAC which identifies Mr. Straub as its Sole Member and Sole Director." (PX 27, at 27-2, ¶ 7). Similarly, Mr. Galle also attached as "Exhibit 'C'" to his Certification a purported "true and correct copy of the Limited Liability Company Agreement for Miss IP" again asserting that it showed Mr. Straub was its "100% owne[r]." (PX 27, at 27-3, ¶ 9). The agreements attached as Exhibits B and C to Mr. Galle's New Jersey Certification are the same agreements filed before this Court and the Florida state court.

46. ***Bankruptcy Court, Southern District***:[2] On November 22, 2024, Mr. Straub filed a petition in Bankruptcy in the U.S. Bankruptcy Court for the Southern District of Florida, entitled *In re Miss America Competition, LLC*, Case No. 24-22288 EPK (Bankr. S.D. Fla. Nov 22, 2024) (BK. DE 1) The petition was signed by Mr. Straub electronically.

47. The Bankruptcy Court requires entity debtors to file proof that they have corporate authority to file the petition. On November 25, 2024, a Resolution Authorizing Bankruptcy was filed, signed by Mr. Straub and claiming authority as sole member and manager pursuant to the Limited Liability Operating Agreement dated December 28, 2022. (BK DE 5).

48. Ms. Fleming filed a Motion to dismiss for lack of authority. Mr. Straub responded pointing to the operating agreement (page 3) (BK DE 16).

49. Attached to the response is an alleged copy of the Operating Agreement dated December 28, 2022 for Miss America Competitions, LLC. For the reasons earlier stated this agreement is a

---

[2] Pursuant to 28 U.S.C. 5157(d), the findings set out in this order constituting good cause therefore, to the extent necessary to accord the relief granted in this order, the court withdraws the reference of the Chapter 11 bankruptcy case filed in the district for Miss America Competition, LLC, Case No. 24-22288-EPK. Docket entries in the bankruptcy case are referenced in this order using the text "BK DE___".

fabrication. (BK DE 16, p. 7-17)

50. Also attached as exhibit is the Order of the state court granting preliminary relief in the state court case brought by Mr. Straub.  The State Court Order reflects that it was based in large part on the Operating Agreements attached to the state court complaint, verified by Mr. Straub, claimed to be "genuine, true, and correct copies." (BK DE 16, p. 11-12, ¶¶ 21- 22).

51. A hearing was held on Ms. Flemings Motion to Dismiss on November 27, 2024. (BK DE 44). Counsel for Mr. Straub relied upon the fabricated operating agreements starting on page 16.

52. Chapter 11 debtors need to seek authority to retain counsel.  The request for authorization is signed electronically by Mr. Straub and claims as authority the operating agreement. (BK DE 24).

53. On December 11, 2024, the Debtor moved to dismiss its own petition.  Again it was argued that the Chapter 11 petition was filed pursuant to the authority of the December 28, 2022 operating agreement. (BK DE 30, ¶ 3). The motion was unopposed and granted.

### The Counterclaim in this Court

54. On May 20, 2025, Mr. Straub and PBP submitted the Signed Operating Agreements that Mr. Galle sent to Ms. Fleming's counsel on April 16, 2024, as Exhibits 2 and 3, respectively, to their Counterclaim against Ms. Fleming in this action.  Mr. Straub and PBP declared the Signed Operating Agreements to be "genuine, true and correct" copies.

55. On August 15, 2025, presented a copy of its Motion for Sanctions (DE 97), on former and present counsel to start the 21-day Safe Harbor for purposes of Rule 11.

## IV.   INTERROGATORIES TO COUNSEL

Following the evidentiary hearing and upon concluding that the Operating Agreements and minutes were not authentic, I decided further investigation was required. After conferring with

Bankruptcy Judge Kimball, I withdrew the bankruptcy reference and served interrogatories on counsel in the Florida state case, the bankruptcy case, and former and present counsel in this action. (DE 196). I did not seek responses from counsel in the New Jersey action.

I asked for the source of documents utilized in their filings, any pretrial investigation that was conducted with respect to the authenticity of the documents, and what investigation if any was conducted after claims were made of fabrication, and what reasons, if any, absolves counsel of sanctions. (DE 196).

Larry Zink, counsel in the Florida state case, indicates he received the Operating Agreements from Craig Galle, which were attached to the Verified Complaint which was signed by Glenn Straub. He states that he justifiably relied on the Verified Complaint and affidavits. He further states he was not provided the December 28, 2022 and January 5, 2023 meeting minutes. (DE 199).

C. Craig Eller and Kelly Kaplin Delaney and Eller, PLLC's response indicates that the source of the documents needed to complete the bankruptcy filing and to support the arguments made in the bankruptcy court were Craig Galle. Their response further states that the primary corporate document relied upon was the Operating Agreement. The firm's retainer agreement indicated that Mr. Straub was the sole member and manager of Miss America Competitions, LLC, and had legal authority to file the Chapter 11 proceedings. Mr. Eller also relied on the state court preliminary injunction Order which appeared to be based upon the Operating Agreement. (DE 202).

Clayton Trial Lawyers, PLLC responded that they were provided the Operating Agreements by Larry Zink, counsel in the Florida state case. They were not provided the meeting minutes. They were provided the Verified Complaint in the state case, signed by Mr. Straub,

preliminary order entered in the state case, and the transcript of the evidentiary hearing in the state court. Clayton Trial Lawyers contend that they relied upon these materials as well as additional conference with Mr. Galle, Mr. Straub, and Mr. Zink. They note that they were no longer counsel when the Rule 11 motion was served and filed, and they also contend, like Kluger Kaplan, that withdrawal of the Operating Agreement exhibits was sufficient to avoid being sanctioned. (DE 203).

Kluger Kaplan indicates that after previous counsel withdrew, they were approached by Craig Galle, who had previously worked at the firm and who they regarded as an honest and ethical lawyer. (DE 200). Mr. Galle advised he would be the primary client contact, but that Mr. Straub would also be a point of contact.

Mr. Galle advised that the state court case was currently stayed but that the state court had entered a preliminary order indicating that Mr. Straub had a substantial likelihood of succeeding on his claim of ownership. Mr. Galle advised the firm of the claim that the Operating Agreements were fabricated and explained the circumstances surrounding his stolen laptop and retyped draft. "Galle represented that the Operating Agreements are legitimate, that he drafted them in late December, and that Straub had signed them at that time." (DE 200 at 4). Mr. Galle also explained that he had prepared, and Mr. Straub had signed, Board Minutes at the end of December 2022 and January 2023, bur that he didn't have metadata for them because the digital version of the minutes were also on his stolen laptop. (DE 200 at 5).

The Kluger Kaplan response indicates that "[d]espite their firm conviction that the Operating Agreements are legitimate, Straub and Galle authorized (the firm) to withdraw them within the safe harbor period to avoid protracted proceedings and/or argument over the bona fides of the documents, especially given the existence of other evidence demonstrating that Straub is the

owner of MAC and MAIP." (DE 22 at 9). Kluger Kaplan insists it is absolved from sanctions because it never filed the Operating Agreements in any court but instead withdrew the Operating Agreements within the safe harbor period. (DE 200 at 14). Nonetheless, despite removing the exhibits and language in the Counterclaim reflecting the exhibits are true and correct copies, Kluger Kaplan continues to maintain, both in the Counterclaim and in this response, that Straub owns MAC and MAIP, the entities allegedly formed by the Operating Agreements. (DE 22 at 14).

Simultaneously with the Response to the Court's Interrogatories, Kluger Kaplan and its attorneys, Todd A. Levine, Terri Ellen Tuchman Meyers, Briana Harris, and Halyna Hnatkiv, moved to withdraw as counsel for Glenn F. Straub and Palm Beach Polo, Inc. Kluger Kaplan asserts that irreconcilable differences have arisen between Kluger Kaplan and the Defendants that preclude Kluger Kaplan from continuing to represent them. (DE 201).

## V.    DISCUSSION

For the reasons fully explained below, and after careful and complete consideration of the foregoing facts and applicable law, I find that sanctions are appropriate both under the Court's inherent powers and Federal Rule of Civil Procedure 11.

### A.  Inherent Powers

The inherent power "is both broader and narrower than other means of imposing sanctions." *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting *Chambers*, 501 U.S. at 46). It is broader in the sense that while other sanctions mechanisms only reach certain individuals or conduct, the inherent power extends to the full range of litigation abuses. *Id.* The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers,* 501 U.S. at 49. "[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power" to sanction bad faith

conduct in the course of litigation." *Id.* at 50; *see also Peer,* 606 F. 3d at 1315.

In my informed discretion, I find that Rule 11 and 28 U.S.C. § 1927 are not "up to the task" of confronting the litigation abuse involved here. Rule 11 is backward looking, limited to pleading and motion abuse, and experience has shown it to be ineffective at deterrence. *See* Fed. R. Civ. P. 11, Advisory Committee Notes. Section 1927 "only applies to unnecessary filings after the lawsuit has begun." *Macort v. Prem Inc.,* 208 F. App'x 781, 786 (11th Cir. 2006). The purpose of the inherent power to sanction a party is to vindicate judicial authority without resorting to contempt of court and to make the non-violating party whole. *See Chambers,* 501 U.S. at 45-46; *see also Purchasing Power, LLC v Bluestem Brands, Inc.,* 851 F.3d 1218, 1223 (11th Cir. 2017).

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton,* 158 F. 3d 1212, 1214 (11th Cir. 1998) (citations omitted). "The inherent-powers standard is a subjective bad-faith standard." *Purchasing Power, LLC,* 851 F.3d at1223. However, absent direct evidence of subjective bad faith, this standard can also be met if conduct is "tantamount to bad faith," meaning the "conduct is so egregious that it could only be committed in bad faith." *Id.* at 1224-25 (citing *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 767 (1980)). A court's inherent power includes the ability to assess attorney's fees and costs against the client, the attorney, or both when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers,* 501 U.S. at 45-46.

Both Mr. Straub and Mr. Galle exercised bad faith in fabricating the Operating Agreements and minutes, falsely claiming they were prepared and executed in December 2022, actually signing the Operating Agreements in April 2024, and causing them to be filed and relied upon in four different courts. They compounded their bad faith by testifying falsely and with purposeful evasion in the evidentiary hearing before me. Since some of the conduct occurred prior to any litigation in

the federal courts, inherent authority is necessary to vindicate judicial authority and emphasize that this kind of fraud on the court cannot be tolerated.

### B. <u>Rule 11</u>

In general, Rule 11 is violated and sanctions are warranted when a party files a pleading, motion or paper that (1) is filed for an improper purpose (*see* Rule 11(b)(1)); (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law (*see* Rule 11(b)(2)); or (3) has no reasonable factual basis (*see* Rule 11(b)(3)). An attorney may be sanctioned for any of these reasons; but a represented client cannot be sanctioned for violation of Rule 11(b)(2) for a legally frivolous pleading. *See* Fed. R. Civ. P. 11(c)(5)(A). However, Rule 11 does impose on objective standard of reasonable inquiry on represented parties who sign papers or pleadings. *Bus. Guides, Inc. v. Chromatic Commun. Enters.*, 498 U.S. 533 (1991).

An attorney's obligations with respect to the contents of pleadings or motions are not measured just at the time a pleading or motion is initially filed, but also as the time when the attorney having learned the claims lack merit, reaffirms them to the court. *Gulisano v. Cohen,* 34 F. 4th 935, 942 (11th Cir. 2022); *Turner v. Sunhard Bus. Sys., Inc.,* 91 F. 3d 1418, 1422 (11th Cir. 1996).

Apart from the prohibition with respect to legally frivolous pleadings, it is not improper to impose sanctions against a represented party. Where a client has made a "knowing factual misrepresentation" or is the "mastermind" behind the frivolous case, sanctions against a client are appropriate. *Johnson v. 27th Ave Caraf. Inc.,* 9 F. 4th 1300, 1315 (11th Cir. 2021) (quoting *Byrne v. Nezhat,* 261 F. 3d 1075, 1118 (11th Cir. 2001) (cleaned up), *abrogated on other grounds* as recognized by *Jackson v. Bank of Am., N.A.,* 898 F. 3d 1348, 1357 n. 10 (11th Cir. 2018).

When deciding whether to impose sanctions under Rule 11, a district court must conduct a two-step inquiry determining (1) whether the party's claims are objectively frivolous and (2) whether the person who signed the pleadings should have been aware they were frivolous. *Gulisano v. Burlington, Inc.,* 34 F. 5th 935, 941 (11th Cir. 2022); *Baker v. Alderman,* 158 F. 3d 516, 524 (11th Cir. 1998). Factual claims, such as those at issue here, are frivolous where there is no factual basis. Gulisano, 34 F. 4th at 942 Sanctions are warranted when an attorney exhibits "a deliberate indifference to obvious facts." *Id.* (internal quotation marks omitted).

Pursuant to Rule 11, I find Mr. Galle and Mr. Straub are both subject to sanctions. Both made a knowing factual misrepresentation claiming legitimacy of the Operating Agreements and minutes. After a dispute arose concerning ownership, Mr. Straub asked Mr. Galle for documentation of his claim. Mr. Galle sent Mr. Straub the Operating Agreements in April 2024, he signed them, and Mr. Galle and Mr. Straub falsely claimed they were created and signed in December 2022.

Mr. Galle was the source of the documents and principal client contact to both former and present counsel. I do not find that either former or present counsel had sufficient reason to know of the fabrications. They reasonably relied upon Mr. Galle and Mr. Straub and did not have the benefit of sworn testimony and cross-examination.

## C. **Sanctions**

### 1. *Dismissal of Counterclaim*

"If, as the Bible says, [a]n honest answer is like a kiss on the lips, Proverbs 24:26 (N.I.V.) a pleading founded on a lie is like a kick in the gut." *Zocaras v. Castro*, 465 F. 3d 479, 481 (11th Cir. 2006). The issue in *Zocarus* was whether a case could be dismissed with prejudice because the plaintiff filed and litigated his complaint under a false name. The Eleventh Circuit stating that

"the sanction imposed should fit the interests jeopardized and the harm caused by the violation," had "no hesitation in concluding that a party who files suit under a false name and proceeds with that deception right up to trial loses the right to seek judicial relief for the claims he was advancing." *Id.* at 485.

The harsh sanction of dismissal with prejudice is thought to be more appropriate in a case where a party, as distinct from where counsel, is culpable. *Betty K Agencies, LTD v. M/V Monada*, 432 F. 3d 1333, 1338 (11th Cir. 2005).   For example, in *Gratton v. Great American Communications*, 178 F. 3d 1373 (11th Cir. 1999), dismissal was affirmed where the plaintiff was personally culpable for flouting discovery rules, misidentifying a witness, destroying evidence and ignoring court orders.

A recent unpublished decision of the Eleventh Circuit is especially pertinent to the facts here. *See Frazier v. Se. Ga. Health Sys., Inc.,* 2024 WL 4357399 (11th Cir. Oct. 1, 2024).   There, the court affirmed dismissal with prejudice because "ample evidence" supported the district court's finding that "the Fraziers fabricated and attempted to rely on a piece of evidence that would prove their case, and continued to testify as to its veracity, showing a clear pattern of willful contempt for the proceedings." *Id.* (citation omitted).

Not only is the Eleventh Circuit conclusion squarely applicable here, but the facts bear a striking resemblance. In *Frazier*, the plaintiffs' brought suit for medical malpractice and fabricated a video which supported their claim that a surgeon had erroneously left gauze or packing in the plaintiff's nasal cavity casing pain and injury.   The defendants requested original video files and metadata, but it was not produced and could not be located.   Inspection of the doctor's offices where the plaintiff claimed the video was taken revealed significant discrepancies between features of the room and the video.   After an evidentiary hearing and determination by a magistrate judge,

the district court found that the plaintiffs "abused the judicial process and committed fraud upon the court when they fabricated the YouCut video and submitted it to Defendants during discovery." *Frazier v. Se. Ga. Health Sys., Inc.*, 2024 WL 889994 at *9 (S.D. Ga. Mar. 1, 2024). "Plaintiffs acted in bad faith, abused the judicial process, and committed a fraud upon the Court by fabricating video evidence, submitting it to the Court and relying on that evidence during litigation. Because their conduct was willful and egregious, sanctions other than outright dismissal with prejudice are inadequate." *Id.* at *18. In answer to the plaintiffs' contention that they had other evidence that supported their claim, the court noted that it was pivotal to their claim and stated: "The rule [p]laintiffs urge—that fabricated evidence cannot result in dismissal so long as it is not a party's only evidence—is not the law and, for obvious reasons, never should be." *Id.* at *14.

A second unpublished Eleventh Circuit opinion is also persuasive. *Forsberg v. Pefanis*, 634 Fed. Appx. 676 (11th Cir. 2015) involved an appeal after the district court struck the appellant's answer in a sexual harassment case, which was then tried to a jury on the plaintiff's well pleaded allegation and a punitive damages verdict returned. The answer was stricken after the defendant submitted a false statement purportedly from a witness denying seeing the inappropriate conduct.

*Pefanis* challenged the decision to strike the answer arguing that the false statement had not been used to gain advantage in court and was inadmissible. He contended that a false document must be introduced into evidence before sanctions could be imposed and that forged evidence alone is insufficient to strike an answer if other evidence existed. Finally he argued that the plaintiff was not harmed by the statement. *Id.* at 679-80.

Writing for the Court, Judge Pryor rejected those arguments, pointing out that the false statement was submitted in connection with a motion and listed as a pretrial exhibit. "It would be strange to require a district court to wait until false evidence is introduced at trial before sanctions

are appropriate, all the while wasting the time and resources of the court and the opposing party..."
*Id*. at 679.

The submission of false evidence is sufficient cause for sanctions regardless whether other evidence might exist. *Id.* Those who lie, evade, and fail to tell the truth gain an advantage over honest litigants who are forced to devote substantial resources to respond to the lies and distortions. *Id*. at 680 (quotations and citation omitted). *See also, Oniha v. Delta Airlines*, 2022 WL 580933 (11th Cir. Feb. 25, 2022) (affirming dismissal with prejudice where plaintiff fabricated evidence and lied about it).

Circuits outside the Eleventh are in accord. One case notable in terms of both motive and intent of the fraud is *Aoude v. Mobil Oil Corp.*, 892 F. 2d 1115 (1st Cir. 1989). There, in a surreptitious effort to acquire a Mobil franchise, Mr. Aoude concocted, backdated, and persuaded the seller to sign a bogus purchase agreement reflecting a price nearly twice actually paid. He did this to force Mobil to honor the purported assignment. *Aoude* gave the agreement to his counsel who attached the bogus agreement to his suit against Mobil. Discovery ensued, document production took place, but not until the sellers deposition was taken did the truth emerge. Aoude was confronted with the sellers testimony and admitted to the scheme. It took another three months after his deposition was taken before he moved to amend his complaint to substitute the authentic purchase agreement for the bogus agreement.

Mobil threatened the seller with revocation of his franchise based in part on his dealings with Aoude. Mr. Aoude retained new counsel who filed a second action against Mobil adopting the factual allegations of the first suit, but abandoning reliance on the phony contract. The new complaint also alleged violations of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-

2806 (1982).  After argument the district court dismissed both actions, stating that "plaintiff's entire case rests on a false foundation." *Aoude*, 892 F. 2d at 1117.

While noting the district court's "great circumspection" in delineating the sources of authority which led to the dismissal, the Court of Appeals said it was "not similarly inclined": "It strikes us as elementary that a federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court." *Id*. at 1118.

> There is an irrefragable linkage between the courts' inherent powers and the rarely-encountered problem of fraud on the court. Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system.

*Id.* at 1119. The Court concluded:

> We need go no further.  Appellant chose to play fast and loose with Mobil and with the district court.  He was caught out.  The judge considered the relevant factors and acted well within his discretion: appellant's brazen conduct merited so extreme a sanction; Mobil, having undergone extra trouble and expense, had a legitimate claim to dismissal; and the court, jealous of its integrity and concerned about deterrence, was entitled to send a message loud and clear.

*Id.* at 1122; *see also Kassbach v. Montefiore Med. Ctr.,* 81 F. 4th 124 (2nd Cir. 2023) (affirming dismissal where plaintiff fabricated text messages and after challenge testified falsely); *Pope v. Federal Express Corp.*, 974 F. 2d 982 (8th Cir. 1992) (affirming dismissal of Title VII claim with prejudice where plaintiff produced manufactured document and lied about it).

Here the operating agreements and minutes are pivotal to Mr. Straub's claim of ownership. He has caused the documents to be filed with four different courts, one of which relied upon them in granting preliminary relief. Mr. Straub and Mr. Galle have persisted in insisting on the genuineness of these documents even after being confronted with the deficiencies, and even after current counsel withdrew the Operating Agreements as exhibits. Moreover, the newly advanced

story about the stolen laptop, and the various versions of the agreements reflects contempt for these proceedings. The fabrications are willful and egregious, constitute fraud upon the court, and no alternative to dismissal of the counterclaim with prejudice would be sufficient.

### 2. *Attorney's Fees*

"[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45–46 (cleaned up). "In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party." *Id.* at 46 (cleaned up). "The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicate[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent[]. . . .". *Id.* (cleaned up).

In this case the fraud on the court perpetrated by Mr. Straub and Mr. Galle in using the fraudulent operating agreements and board minutes as the linchpin for Mr. Straub's claim of ownership merits an award of attorney fees. The question becomes how much.

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017) is the controlling authority. There the Supreme Court held that a court can shift only those attorney's fees incurred because of the misconduct at issue. Compensation for a wrong tracks the loss resulting from that wrong. The causal connection required is appropriately framed as a but for text. Recovery can only be awarded for those fees that would not have been incurred "but for" the misconduct. In the exceptional case—*Chambers v. NASCO* is one such example—all of the legal fees can be recovered where a court can reasonably conclude that all legal expenses were caused solely by fraudulent or brazenly

unethical efforts. *Id.* at 110-111. The but-for test can also be applied to a portion or phase of litigation. *Id.* at 109-110; *see also, J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F. 4th 1340 (11th Cir. 2024).

With this guidance in mind, I find that all fees incurred by the Plaintiffs in proving the fraudulent documents, both the Operating Agreements and board minutes, are recoverable. That includes fees incurred in connection with the sanction motions, the two-day evidentiary hearing, and the briefing and memoranda required to litigate these issues. Additionally, for the reasons stated in that part of this order dismissing Mr. Straub's Counterclaim, all fees that Plaintiffs incurred in defending that claim are recoverable. The fraudulent documents are the heart of the Counterclaim and infect every part of it.[3]

Similarly, the bankruptcy filings and hearing hinged entirely upon the fraudulent documents. Mr. Straub personally signed the petitions and claimed authority to do so based upon the Operating Agreement. He relied upon the agreement in seeking authority to retain counsel, in his response to Ms. Fleming's motion to dismiss, in argument at the hearing, and in his motion to dismiss his own petition. As a result, all fees incurred for the bankruptcy filing were caused solely by the fraudulent and unethical conduct and are recoverable.

While the fraudulent documents were relied upon in the state court litigation and appear to have been critical to the Order granting preliminary relief, I question my authority to authorize recovery of fees in that litigation. I believe the better course is for me to provide a copy of this Order to the state court for any appropriate action.

---

[3] Plaintiffs' Complaint against the Defendants, on the other hand, contains a number of claims and theories of recovery. While some of those claims arise from and are based on the fraudulent documents, others, such as the defamation claims, are unrelated to this misconduct. Unless billing records can be segregated to show work which would not have been necessary "but for" the misconduct, fees related to Plaintiffs' complaint are not recoverable.

## VI.    CONCLUSION

For the foregoing reasons, and pursuant to the court's inherent power and Federal Rule of Civil Procedure 11, sanctions shall be imposed against Glenn T. Straub and Craig Galle. Since I find that counsel who signed the pleadings in this case and the bankruptcy case reasonably relied upon Mr. Straub and Mr. Galle, as well as counsel in the state court proceeding, sanctions are not appropriate against those counsel.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.    Plaintiffs' Motion for Sanctions (DE 97) is **GRANTED.**

2.    Sanctions against Glenn T. Straub and Craig Galle are **ORDERED** as follows:

   a.    The Defendants' Amended Counterclaim is **DISMISSED WITH PREJUDICE**.

   b.    Plaintiffs are **AWARDED** reasonable expenses, including attorney's fee and costs, to be paid jointly and severally, against Glenn T. Straub and Craig Galle for:

   i.    Plaintiffs' fees associated with service and filing of the Plaintiffs' Motion for Sanctions, the December 11, 2025 Zoom hearing, the January 30, 2026 evidentiary hearings, and related filings.

   ii.    Plaintiffs' fees associated with defense of Defendants' Counterclaim.

   iii.    Plaintiffs' fees associated with the bankruptcy proceedings.

   iv.    Plaintiffs' fees associated with matters in Plaintiffs' Complaint, to the extent that such expenses can be identified and segregated which involved litigating the legitimacy of the Operating Agreements and minutes.

3.    On or by **March 31, 2026**, Counsel for Plaintiffs shall serve and file an affidavit of their reasonable expenses, as outlined above, and confer with Mr. Straub and Mr. Galle and/or

their counsel. If agreement cannot be reached as to the fee amount, Mr. Straub and/or Mr. Galle shall file detailed objections to Plaintiff's proposed costs and fees by **April 6, 2026**.

4. A copy of this order shall be provided to the State Court for any action deemed appropriate.

**SIGNED** in chambers at West Palm Beach, Florida this 9th day of March, 2026.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE